Hartley *v.* Hartley, Appellant.

Argued November 8, 1943. Before KELLER, P. J., BALDRIGE, STADTFELD, RHODES, HIRT, KENWORTHEY and RENO, JJ.

*John M. Bennett,* of *Weimer & Bennett,* for appellant.

*Frank P. Barnhart,* for appellee.

OPINION BY RENO, J., January 27, 1944:

The husband, appellee here, seeks a divorce for cruelty and indignities. The master recommended that a decree be refused. The court below, without filing an opinion, sustained exceptions to the master's report, and granted a divorce for indignities. After the respondent appealed, the court below, pursuant to our Rule 58, filed an opinion in which, inter alia, it said: "The testimony establishes one absolute certainty, that

these people were incompatible and that it was impossible for them to get along as husband and wife. When we read the testimony and report of the master, which suggested that indignities to the person were not made out, we felt that if the testimony of the libellant were true, or substantially true, there was enough in it to satisfy the burden of showing indignities to the person which rendered his condition intolerable and life burdensome, and felt that we were justified in awarding the divorce. After a careful reading of all of the testimony in this case, however, we feel that we should, perhaps, have given more consideration to the master's report because of the fact that he had the parties before him and heard their testimony, and that if we had been in the master's place we might have made the same findings as he did. We still believe that there is enough testimony on the part of the libellant which, if substantially true, would justify a divorce on the ground of indignities to the person." We have profited by the master's report, and we have attentively studied it as well as the testimony. Our independent examination of the case requires us to reverse the decree.

We agree with the court below "that these people were incompatible and that it was impossible for them to get along as husband and wife." To that, we add the judicial bromide that incompatibility of temperament is not a ground for divorce. The regrettable fact that married people do not get along together does not authorize us to loose them from the bonds of matrimony.

Lack of harmony (*Mentser v. Mentser*, 136 Pa. Superior Ct. 582, 589, 7 A. 2d 541) ; an unhappy marriage (*Stevenson v. Stevenson*, 151 Pa. Superior Ct. 578, 579, 30 A. 2d 675) ; slight altercations, incompatibility, temporary irritations (*Knox v. Knox*, 109 Pa. Superior Ct. 45, 48, 165 A. 769), do not justify a divorce. "Where both parties are nearly equally at fault, so that neither can clearly be said to be 'the injured and innocent spouse,' [within the meaning of The Divorce Law of

May 2, 1929, P. L. 1237, §10, 23 PS §10], the law will grant a divorce to neither": *Daly v. Daly,* 137 Pa. Superior Ct. 403, 9 A. 2d 192. Moreover, if the alleged indignities are provoked by the complaining party they furnish no grounds for a divorce unless the retaliation is excessive: *Esenwein v. Esenwein,* 312 Pa. 77, 167 A. 350. A divorce based merely upon a slight preponderance of the evidence, unsupported by clear proof of imperious reasons, will not be granted; and when the testimony of the libellant is contradicted and shaken by respondent, only convincing circumstances will warrant disregard of respondent's evidence: *Cobaugh v. Cobaugh,* 146 Pa. Superior Ct. 521, 22 A. 2d 764.

This record is replete with marital woes. The husband evidently treasured every incident of discord in his three years experience as a husband, compiled copious notes, and made them the basis of his testimony. Most of the incidents he describes are petty and trifling, amounting to nothing in detail and, therefore, adding up to precisely nothing. Others of more serious import were provoked by his own conduct, or else his version of them is denied by respondent whose testimony shakes, if it does not completely demolish, his case. He has not presented a case which, under the principles we have stated, entitles him to a divorce.

A few sample episodes will indicate the pattern of his case. He charges that respondent threatened to prevent him from joining the Masonic fraternity; respondent testified that she had merely told him that he would never qualify for that organization because of his conduct at home. He testified that she nagged him for bathing "from his feet up"; she admits that she "may have said to him that it was a funny way of washing but I did not nag." He found fault about the food, that it was the cheapest kind of food and that he lost weight, but he could not tell when the food was not good nor any particular food that was not good, except that vaguely he remembered a dish of beans that

he did not like. She insists that she served the foods called for by the diet prescribed by his physician, that he gained weight so long as he adhered to the diet and that his voracious appetite for apple fritters, of which he would consume twenty or twenty-five at a sitting, was responsible for his trouble. He did not deny his abnormal craving for apple fritters. He complained because she permitted the furnace fire to go out; she counters that at "times in the evenings when I would go to bed and I would leave it on thinking he would soon be home but by the time he got home it was completely burned out."

Turning to more serious complaints, we note a dispute about the house in which they lived. Before the marriage he purchased the house under articles of agreement, and gave as collateral a life insurance policy on his own life and in which his mother was the beneficiary. After his marriage he refused to change the policy and respondent, he alleges, threatened to burn the property. She was indeed capable of a bit of temper. Several times she slapped him; on one occasion, at least, his nastiness richly deserved that form of physical rebuke. Once, she would not permit him (he was six feet two inches tall!) to leave his bedroom for over an hour. He says that he was thus punished because he had procured license plates for his automobile. She says that he should not have purchased license plates; for at that time he was not earning enough to justify the expenditure; that she imprisoned him, not on account of the plates, but because he had taken from her and refused to return to her a memorandum of unpaid bills which she had compiled. He tells of her placing her cold feet on his back in bed; she says she wanted to warm them, and probably him; and out of this episode grew a whole series of events culminating in his sleeping alone on a davenport against her protests. This, he contends, was an indignity because he had no blankets,

but there were many in the house which he might have used. Once, and of this he complains stridently, she let the air out of his tires late at night. He says that she knew he wanted to use the automobile early the following morning to go to work; she avers that she did it to keep him from following his usual practice of going out at night; and, finally, in the very last minutes of the hearing he admitted that only a part of the air had been taken out of the tires and he was able to use the car to go to work the following morning. Of such incidents is this record compounded, and further details are unnecessary.

She was not without her grievances. The court below found: "She said that the things that caused dissension between them were the things that he did and his actions around the house. He would pick his nose and wipe it on the wall, go to the bath room and never flush the commode; he would drag coal all through the house deliberately, because there were plenty of places to wipe his feet; he would put tobacco ashes all over the house, even in the chandelier; he would take his bedroom slippers and put them in vases on the table; he would string toilet paper all around the bath room; at the table he would eat real fancy, sticking his fingers out; and he would dance and wiggle around the house saying he had snake hips and wouldn't she like to have them. She said he also refused to pay her insurance, saying if anything happened to her the borough could bury her."

He did not deny these charges. We need not hold that they justified her conduct. It is enough to declare again that when two people are nearly equally at fault, we cannot undertake to evaluate their domestic dissensions with mathematical precision, and grant a decree to that one who is fractionally less culpable. In such a case we leave the parties in the position they have made for themselves.

Decree reversed and libel dismissed.