## Lupowitz, Appellant, *v.* Lupowitz.

Argued March 29, 1951. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ.

*Harry Shapiro,* with him *William Ginsburg,* for appellant.

*Louis Lipschitz,* for appellee.

OPINION BY GUNTHER, J., October 5, 1951:

Sidney Lupowitz, appellant, instituted this action in divorce charging indignities to the person. A master was appointed and after conducting eight hearings at which voluminous testimony was taken recommended that a divorce be granted on the ground alleged. Blanche Lupowitz filed exceptions to the master's report which the court below sustained concluding that a doubtful balance of the evidence existed and dismissed the complaint.

We are obliged to review the record and make an independent investigation of the evidence, pass upon its weight and credibility of the witnesses and reach an independent conclusion upon the merits as to whether a legal cause for divorce has been well established. *Cutter v. Cutter,* 165 Pa. Superior Ct. 103, 104, 68 A. 2d 192. After a careful examination of the record of 965 pages we are constrained to differ with the learned court below. We are all agreed that appellant has met the burden cast upon him of sustaining the charge of indignities to the person by a clear preponderance of the credible evidence. The decree will be reversed.

The parties were married in Philadelphia on July 14, 1946, and while on their honeymoon stopped to inquire for accommodations at a summer hotel resort in New York. Appellant testified that he and his wife went into the lobby of this hotel and were told that the rate per day was $22.00. When appellant stated to his wife that he was financially unable to pay these prices, appellee, in the hearing of a number of guests and hotel employees, berated appellant by calling him a "gambler" and a "cheap-skate" and caused quite a

scene. Appellee denies being in the lobby of the hotel or that any argument took place as testified to by appellant. Upon their return from their honeymoon, appellant testified that his wife had her engagement ring appraised by a jeweler who advised her that the ring was "off color" and not a good ring. Appellant testified that his wife told him "if she had known that I wouldn't get her a ring of greater value, something that she could wear proudly, that she would not have married me". She again berated appellant and called him a "cheap-skate".

Approximately one month after the marriage, appellant told his wife that his father had an apartment house available for them in Melrose Park, Pennsylvania. Up to this time, the parties were residing with appellant's in-laws. Appellee, in a disdainful manner, stated that under no conditions would she be willing to live under the same roof with appellant's parents; that she would have nothing to do with his parents. Housing accommodations continued to be a source of dissension; appellee insisted that they live at the home of her parents much against appellant's wishes. The parties, however, continued to live at the home of appellee's parents for approximately four months until November, 1946. During this period appellee, together with her parents, continually reminded appellant that he was being supported by them; that he was not making enough money to support his wife and that if he did not earn at least $200 a week he should not have married appellee. During this period, appellant found several apartments that were available for immediate occupancy, but on each occasion appellee turned up her nose at the accommodations suggested by appellant and stated that she would not live in such small and unpretentious apartments; that he had no business marrying her unless he could furnish her with accommodations at least as sumptuous as those of her par-

ents. During these arguments appellee constantly used vile and vituperative language such as "cheap-skate", "gambler", "son-of-a-bitch", "cheap", and others.

Shortly after their return from their honeymoon, the parties with three other couples went to the Bath and Turf Club in Atlantic City. As the parties were seated, the waiter came to take their order, whereupon appellee asked her husband to dance. Appellant suggested that they order their meal first, explaining that it took a long time to get their order between dances. Appellee became incensed and in the presence of the group called appellant vile and opprobrious names, much to his embarrassment and humiliation. Appellant's version of this incident was corroborated by the testimony of several of the parties present at the time.

Shortly after the parties were married, appellant liquidated the business in which he was associated with his brothers. He was then employed by his father-in-law in connection with the operation and management of rooming houses, furnished rooms and apartment business. Appellant worked for his father-in-law off and on until March, 1947, receiving $75.00 a week for collecting rents, purchasing supplies, taking care of complaints, seeing that things were run orderly, and assisting generally in the management and operation of the rooming house business. On several occasions, appellant complained about the way the business was conducted and complained that some of the rentals collected were not in accordance with O.P.A. regulations; that other rooming houses were being conducted for immoral purposes. When he discussed these matters with his wife, she would become enraged and scream that appellant was a "whore master", "bastard", "liar", "thief", "gambler", "son-of-a-bitch" and "cheap-skate". In one of these arguments, appellee falsely accused her husband of infidelity and of carrying on an affair with one of the women who lived in one of the

rooming houses. These false accusations of infidelity continued until the parties separated.

Appellant left the employ of his father-in-law and formed a partnership with another man, and his new position required a lot of night work. On a number of occasions beginning in April and continuing through June, 1947, appellee falsely accused appellant of staying out in the evening for the purpose of engaging in immoral practices with the daughter of his associate and others. After these accusations were made, appellee on several occasions admitted that her accusations were untrue; that she knew they were untrue but stated that she said them in a fit of temper with the intent of injuring and hurting her husband.

In November, 1946, the parties moved to their own home in the Melrose Court Apartments. Prior thereto, appellee, her mother, and appellant's mother and sister went shopping for furniture for the new apartment. Appellee, in the presence of these parties, said that she wished to pick her own furniture and had an argument with her mother. When appellant confronted her with the scene that she created in the furniture store it was the signal for appellee to heap upon appellant a verbal attack of humiliating and abusive language.

Around the first of January, 1947, there was a family meeting in an effort to reconcile the differences of the parties at which time appellee, in a fit of anger, and in the presence of these relatives, said that "The reason I got a divorce from my first husband was because his mother was a son-of-a-bitch. I suppose it will be the same thing now". Appellee's recollection of the episode, in part, typifies her testimony generally. She testified: "I remember there was a visit and an attempt to reconcile, but actually what happened I just can't recall".

Without prolonging the further details of this unfortunate marriage, suffice it to say by way of sum-

mary that there is sufficient evidence, corroborated in material respects, that appellee demanded money far beyond appellant's financial ability to do so and provoking arguments when such funds were not forthcoming; that she continually played the radio to the annoyance of other residents in the apartment causing complaints and dissension which became most embarrassing to appellant; that she had a fight with one of her maids almost resulting in blows; that in the Spring of 1947 at a dinner at the home of appellee's parents she flew into an uncontrollable rage and called him a "son-of-a-bitch", she said to her father "You old goat, you keep out of this" and beat her fists against her father's chest. When appellant attempted to intercede, she turned on him and called him a "son-of-a-bitch" and told him "you keep out of it".

It is recognized, concerning credibility of the parties and their witnesses, that a trier of fact who sees the parties and their witnesses and hears them testify has a distinct advantage, for in determining which of contradictory statements should be accepted as true, the demeanor of witnesses as they testify and other influential indicia of credibility are observable by the master alone. His rulings on credibility are, therefore, to be given full consideration. *Korona v. Korona,* 166 Pa. Superior Ct. 297, at 299, 70 A. 2d 399; *Megoulas v. Megoulas,* 166 Pa. Superior Ct. 510, at 512, 72 A. 2d 598. After a careful review of the entire record, we feel constrained to agree with the master's finding that the credible evidence resides on the side of appellant. Our independent examination of the record discloses appellee to be a cold, heartless and spoiled child of well-to-do parents; that she was reared extravagantly and enjoyed all the luxuries appears from the record. Her conduct discloses that she had during this marriage not the slightest conception of her obligations and duties concerning her husband and

others. Her conduct can be accounted for only by the presence of a deep-seated hatred for her husband, no doubt arising in part from her disappointment in realizing that the present financial position of her husband forbid her enjoyment of the luxuries and sumptuous living she had previously enjoyed.

Apart from denials, appellee's testimony in many particulars is vague, general and in some respects contradictory. At other times it was given in such a belligerent and truculent manner as to cast a cloud of doubt upon its veracity. Moreover, appellee's convenient inability to recall the nature of her conduct or to contradict others concerning some of the flagrant incidents with which appellant's testimony confronted her, exhibited another inherent weakness. Such testimony is significant, especially where the credibility of the witnesses is the crux of the case. Even the court below recognized this frailty when it said ". . . there is some contradiction and some admission by wife-defendant . . ." concerning the charges made. The court below concluded that the balance of the evidence was tipped in favor of the appellee because of her pregnant condition. We believe the testimony was over-evaluated in this regard, and especially the testimony of a doctor called by appellee. This doctor testified that appellee enjoyed a normal pregnancy and a normal delivery accompanied by more than the usual nervousness common during such periods. There appears, however, little evidence arising from her condition which in any way excuses or explains the flagrant misconduct of which this record convicts her, many of which incidents were provoked by her misconduct or occurred at times when pregnancy afforded no justification whatever.

It seems unnecessary to recite in detail other misconduct of the appellee. Suffice it to say that the record clearly establishes that appellee has, without justification, habitually called appellant vile and indecent

names in the presence of others; that she has insulted, humiliated and embarrassed him in public; has falsely accused him of infidelity and has exhibited such a manifest disdain and settled hate toward appellant which clearly constituted a course of conduct rendering his condition intolerable and his life burdensome.

The decree dismissing the complaint is reversed, the complaint is reinstated and the record is remitted to the court below with direction to enter a decree of absolute divorce.