Politylo *v.* Politylo, Appellant.

Argued November 13, 1952. Before RHODES, P. J., HIRT, RENO, DITHRICH, ROSS and GUNTHER, JJ. (ARNOLD, J., absent).

*William J. Graham*, with him *Clyde P. Bailey*, for appellant.

*Morris A. Mendlowitz*, for appellee.

OPINION BY ROSS, J., April 14, 1953:

In this divorce action the wife plaintiff was granted a decree on the ground of indignities to the person, and the husband has appealed to this Court.

The parties were married on July 26, 1938 and lived together at various addresses in the suburbs of Pittsburgh. Plaintiff left defendant at least five times prior to the final separation on January 26, 1944. Three minor daughters live with plaintiff, and defendant supports them by order of the County Court of Allegheny County. A son died at birth.

The parties spent their honeymoon at Niagara Falls. Here begins the first of a lengthy series of incidents on which plaintiff bases her case. We recite it in detail because it is typical of the general tenor of her accusations throughout her entire testimony. It seems plaintiff had provided herself with only one pair of shoes which became dilapidated and she wanted her

bridegroom to buy her a new pair, which he refused to do, whereupon she borrowed a needle and thread from the proprietor of the tourist camp and repaired the ones she had. On their return home her mother-in-law lent her a pair and "shamed" defendant into buying her a new pair.

Plaintiff testified further that defendant was not congenial and did not display the proper hospitality when her girl friends visited her but instead retired to his room; that he spent time with men friends "on the corner"; that he chided her about listening to radio soap operas which he considered "kid stuff"; that he gambled but was close with his money where she was concerned; that he kept his money on a shelf in the clothes closet, gave her $5 a week with which to purchase food and required her to keep accounts of the family budget. Arguments would ensue over discrepancies in the budget book. Plaintiff admitted juggling the accounts in order to salvage money for her own use. Defendant would run his finger over the furniture to check on the amount of accumulated dust, but in view of plaintiff's admissions it seems his complaints about her housekeeping were not entirely unjustified. When the parties shopped together defendant paid for the articles purchased and took the change. She complained that he was not personally immaculate but that he wanted his clothes to be clean so she had to wash them every day. He furnished her with insufficient recreation, she testified, and insisted that she return home immediately after going to the movies with her mother.

On one occasion he "spanked" her when she took money from the cash box to buy a maternity coat. The struggle continued to the stairs outside their apartment and defendant held her by the hair until the landlady interceded on her behalf. Defendant purchased

war bonds in his name and those of the children. He grieved over the death of their baby son and seemed to blame plaintiff for the child's death.

When defendant was serving with the armed services he heard rumors that plaintiff was associating with other men and accused her of it—presumably in a letter. That there was at least an apparent basis for his suspicions is established by the testimony of Cecelia Somerfeld, who had divorced her husband Frank and testified that at that trial she had accused him of associating with a married woman whom she identified at the trial of the present case as plaintiff. Plaintiff in rebuttal was asked, "Did you ever run around improperly with Mr. Somerfeld or anybody else?", to which she replied, "No sir, *not improperly.*" (Italics ours.) Somerfeld, also called in rebuttal, in answer to the question whether he had ever associated with plaintiff, stated, "No. Do I have to go into detail, Your Honor?" Continuous unfounded accusations of infidelity, when accompanied by other degrading or humiliating conduct, are sufficient to make out a case of indignities to the person. *Silfies v. Silfies,* 168 Pa. Superior Ct. 421, 426, 79 A. 2d 130; *Turner v. Turner,* 171 Pa. Superior Ct. 519, 521, 89 A. 2d 893; *Thornton v. Thornton,* 168 Pa. Superior Ct. 391, 395, 77 A. 2d 691. There is no evidence that the accusations were "continuous"; in fact, there seems to have been but one, or at most two, such accusations, and in view of Mrs. Somerfeld's testimony, the evasive attitude of her former husband and plaintiff's rebuttal testimony, they were not "unfounded". When the accusing spouse so conducts herself with other men that the husband has just reason to be suspicious, his accusations furnish no support to the charge of indignities. *Cunningham v. Cunningham,* 171 Pa. Superior Ct. 577, 580, 91 A. 2d 301; *Parcella v. Parcella,* 165 Pa. Superior Ct. 218, 67

A. 2d 576; *Kranch v. Kranch,* 170 Pa. Superior Ct. 169, 84 A. 2d 230.

Plaintiff testified that in June 1942, on the advice of a social worker, the parties decided to take a vacation from each other for a period of six months. Upon their return home from the conference with the social worker they became involved in an argument and defendant took the children to his mother's home. Plaintiff succeeded in bringing the children home and on finding herself locked out, broke the glass of the door. She was arrested and the parties thereafter separated until August 1943. Marital difficulties were then resumed and she twice attempted to commit suicide. The circumstances under which the attempts were made, however, cast doubt on their genuineness. The first was made in the presence of defendant who, despite their discordant home life, could be expected to, and did, frustrate it. The second was abandoned in plenty of time.

After the final separation in January 1944 defendant voluntarily gave plaintiff support in the amount of $20 a week in return for the privilege of seeing the children every day. Plaintiff testified to an occasion when he attempted to "force his attentions on" her, after which she refused him admittance to the house. Apparently the episode terminated the voluntary support payments and plaintiff thereafter obtained a support order of $15 a week.

Plaintiff during World War II wrote to the President of the United States in an effort to have defendant drafted, her reason being, as she stated, that she thought "it would help to make a better man of him to realize he has got a family". Later when he was serving with the armed forces she wrote to him that she intended to tell the children that he was dead but she abandoned the idea and did not do so. She ad-

mitted threatening his life "a few times"—on one occasion when he tried to have the children placed in an orphanage—and that she slapped his face and threw a plate of spaghetti at him when he called her father a drunkard.

To obtain a divorce on the ground of indignities to the person plaintiff has the burden of proving legal cause as set forth in section 10 of our Divorce Law, Act of May 2, 1929, P. L. 1237, as amended March 19, 1943, P. L. 21, 23 PS sec. 10. She must show not only that she was subjected to such course of conduct on the part of defendant as rendered her condition intolerable and her life burdensome, by evidence from which an inference of settled hate and estrangement may be deduced (*Monaco v. Monaco,* 160 Pa. Superior Ct. 117, 50 A. 2d 520; *McLaughlin v. McLaughlin,* 170 Pa. Superior Ct. 516, 87 A. 2d 101), but she must also qualify as the "innocent and injured spouse" within contemplation of the statute. *Hunter v. Hunter,* 169 Pa. Superior Ct. 498, 83 A. 2d 401. Our courts will not dissolve a marriage on proof that falls short of fulfilling these requirements. As stated by Judge RENO in *Hartley v. Hartley,* 154 Pa. Superior Ct. 176, 178, 35 A. 2d 591, "The regrettable fact that married people do not get along does not authorize us to loose them from the bonds of matrimony." "Stinginess, surliness, bad temper, irritability and uncleanliness, although provocative of much unhappiness, have never been held sufficient to warrant the granting of a divorce." *Arnold v. Arnold,* 128 Pa. Superior Ct. 423, 428, 194 A. 229, and cases cited therein.

In this case the learned trial judge, who had the advantage of seeing the parties and observing their demeanor on the stand, believed plaintiff's testimony and discredited defendant's. In the matter of credibility we rely heavily on, and are reluctant to disturb,

his findings. *Spence v. Spence,* 167 Pa. Superior Ct. 248, 74 A. 2d 495; *Bliss v. Bliss,* 167 Pa. Superior Ct. 252, 75 A. 2d 1; *Horton v. Horton,* 170 Pa. Superior Ct. 209, 85 A. 2d 602. However, without doing violence to this principle we must reverse the decree. The controlling issues are not here dependent upon estimates of credibility of witnesses but rather upon the conclusions to be drawn from facts established by indisputable evidence. *Orsuto v. Orsuto,* 171 Pa. Superior Ct. 532, 534, 91 A. 2d 284; *Hahne v. Hahne,* 168 Pa. Superior Ct. 324, 77 A. 2d 682.

We have made the requisite examination of the record and have arrived at our independent conclusion (*Celia v. Celia,* 164 Pa. Superior Ct. 569, 67 A. 2d 447; *Lupowitz v. Lupowitz,* 169 Pa. Superior Ct. 581, 83 A. 2d 501) that the incidents narrated by plaintiff, while indicative of a state of domestic infelicity, are to a great degree trivialities which cumulatively do not constitute legal cause, that plaintiff herself provoked many of them and that she is not, therefore, the innocent and injured spouse within the meaning of the statute.

Decree reversed and complaint dismissed.