Rech, Appellant, *v.* Rech.

Argued April 22, 1954. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE and ERVIN, JJ.

*Leonard M. Mendelson,* with him *Sidney A. Sanes,* for appellant.

*F. E. Conflenti,* with him *S. V. Albo, M. E. Catanzaro, H. I. Hoffman* and *Hoffman & Hester,* for appellee.

OPINION BY WOODSIDE, J., August 30, 1954:

This is an appeal from the order of the Court of Common Pleas of Allegheny County refusing Arnold G. Rech a divorce a.v.m.

The appellant filed a complaint against his wife, Louise M. Rech, on September 18, 1952 alleging cruel and barbarous treatment and indignities to the person and on November 25th amended the complaint to include adultery and named Edward Schaub as co-respondent. On February 19, 1953, after a master had been appointed in the above case, the wife defendant in that action filed a counter suit in which she sought a divorce from bed and board. She charged her hus-

band with cruel and barbarous treatment, indignities and adultery, naming "Bobbie" Budin as co-respondent. After numerous and determined attempts on the part of the wife to prevent and delay the hearings, the two cases were joined and finally brought before the master June 8, 1953. All parties, including both co-respondents, appeared and were heard.

The master concluded that neither party is entitled to a divorce. Neither, he held, had proved by a preponderance of the evidence that the other was guilty of cruel and barbarous treatment or indignities. He found and held that the wife had failed to prove that the appellant had committed adultery with Roberta Budin, but held that his relations with her were of such a nature that he is not an injured and innocent spouse, and "therefore is not entitled to a decree in divorce on the ground of his wife's misconduct with Edward Schaub."

Exceptions were taken to the report and argued before one Judge who disposed of the case with a curt, "We have examined the findings of the Master and we fully concur."

It is our duty, as it was the court's below, to not only examine the findings of the master, but to be satisfied by our ". . . own knowledge of the testimony that the averments of the libel have been proved by full and competent evidence." *Middleton v. Middleton,* 187 Pa. 612, 615, 41 A. 291 (1898). "His (the master's) findings have not the conclusiveness of those of an auditor or a master in chancery. They are entitled to consideration by the court, but it is the duty of the latter to consider all the evidence in the case to determine whether the conclusion reached by the master is supported by such weight of evidence as warrants a decree." *Rommel v. Rommel,* 87 Pa. Superior Ct. 511, 512 (1926).

An examination of the record leaves no doubt that the wife was guilty of adultery with Edward Schaub. The master found, and the evidence supports, that they lived together as husband and wife for a period of five or six weeks in June and July 1951.

Was there condonation? The parties separated in May 1951. The wife contended that twice thereafter, once in July of 1951, and again in March 1952 she had sexual intercourse with the appellant. The master did not believe her; neither do we. But assuming she and appellant did have intercourse on these dates, the evidence shows that the appellant did not know of her living with Schaub until September 1952.

As a person cannot condone what he does not know, there could have been no legal condonation by the husband of the wife's adultery until he knew of it. *Davis v. Davis,* 145 Pa. Superior Ct. 473, 21 A. 2d 419 (1941); Act of May 2, 1929, P. L. 1237, §52, 23 PS §52.

Where we part company with the master is in his holding that the appellant should be denied a divorce on the ground that he is not an injured and innocent spouse. The master's report showed great industry on his part and the facts were carefully considered and discussed by him. We do not differ with his findings of fact so much as we differ with his application of the law to the facts which he found.

An understanding of this point requires a review of some of the evidence.

The parties were married February 20, 1939 when he was 22 and she 20. They have two children; Barbara, who is mentally retarded, was born January 24, 1940, and Diana was born September 28, 1943. The appellant was graduated from the pharmacy school of Duquesne University in 1942 and since has been a registered pharmacist, frequently working until 11 o'clock

at night. The parties lived together at various places until they separated May 25, 1951.

There was some evidence concerning indignities on the part of both parties but we see no reason to refer to it. The master properly concluded neither had made out a case on the grounds of cruel and barbarous treatment or indignities.

The beginning of the end came in 1950 when Mrs. Rech met Edward Schaub a salesman in a department store. April of the following year Schaub left his wife and two children; May, Mrs. Rech and the appellant separated, and by June Schaub and Mrs. Rech were living together as husband and wife in a small apartment at the rear of 1139 Portland Street, Pittsburgh. Later Schaub lived with Mrs. Rech's uncle, and still later, having learned through a newspaper advertisement (he says) that Mrs. Rech had a room to rent, he went there and rented it. He lived in the house with Mrs. Rech, her mother and two children and a nurse, until he was named as a co-respondent in this divorce action nearly a year later.

Schaub and Mrs. Rech denied they had lived together as husband and wife but the evidence that they did was overwhelming.

About two months after the Rechs had separated and after Mrs. Rech and Schaub had been living together as husband and wife, Mr. Rech met Roberta Budin a nurse at Shadyside Hospital Dispensary. She lived at 131 Victoria Drive with her mother, father and sister in a second floor apartment. The appellant met her when he took her to a banquet on a "blind date" arranged by a doctor friend. Later he took her golfing and to a night club. He spent considerable time at her home. Some mornings he took her to work.

The original hearing in this case was scheduled for March 19, 1953. It was postponed because of the al-

leged illness of Mrs. Rech. Effort after effort was made to postpone the hearing. Finally the court ordered an examination of the appellee, and finding no merit to her demands for delay, ordered the master to proceed to hearing on June 8th, without further delay. It then appeared that on March 14th Mrs. Rech had employed a private detective to follow the appellant. At the hearing he testified concerning the appellant's visits to the home of Roberta Budin. It was largely on the basis of the detective's testimony that the master refused the appellant his divorce.

It therefore requires analysis. From March 19 to June 6 the detective followed the appellant. During that period he found him with Miss Budin 26 times, or an average of a little over twice a week. This assumes that he was with her the 9 times the detective saw his car parked in front of or near the Budin home, but did not see him. It also assumes that he was with her the 7 or 8 times he saw appellant go into the Budin apartment but did not know who was in there. (Mrs. Budin testified that appellant visited the home at times when Roberta was not there). The appellant frequently left his job between 10:30 and 11 in the evening and went to the Budin home where he stayed until 1:30 or 2 o'clock or later. Once with two other couples he took Miss Budin to a night club. Once or twice when it was raining he came for her in the morning and took her to work.

Once while looking into the Budin apartment from a hill the detective saw the appellant and Miss Budin in a "familiar embrace", and once he saw him kiss her when he left her out at work.

For nearly three months the detective was following the appellant armed with cameras, "building (his) case to bring it to the point where (he) could do either one thing or another", waiting "to find out if (appellant)

would take (Miss Budin) to a motel or a hotel", or if he could "get them behind the 8-ball." Therefore what he did not find speaks louder than what he did find. At no time did he testify the appellant and Miss Budin were in the apartment alone together, at no time was there evidence appellant stayed at the Budin home all night; at no time did they even seem to be together in a dark room; at no time were they seen in the apartment scantily clothed, or doing anything improper except on one occasion when they were in a "familiar embrace"—whatever was meant by that. In his cross examination the detective said about his work on the case "I'm not talking about any morals here or anything else. It has been very clean." All he wanted to show, he says, was a continuation of the appellant's affair with Miss Budin, that they "were going together —continuing to see each other."

At first blush the incident of November 16, 1951 was more damaging to the appellant's case than the testimony of the detective. The appellee in her cross suit charged the appellant and Miss Budin with adultery on that date.

After a careful examination of all the evidence we agree with the master that "what occurred on the evening of that day at the apartment occupied by Roberta Budin, her parents and sister cannot by any stretch of the imagination be construed to place the stigma of adultery upon Miss Budin . . ."

Describing what happened the master said, "Arnold Rech had come to her home around 9:30 P.M. of that day to take her to a club dance and had been admitted to the apartment by her parents who left a few minutes later to visit a neighbor. When he arrived, Miss Budin was in the bathroom taking a shower. She was late in her preparations because she had been up most of the night with a patient, and had been tak-

ing a nap shortly before Mr. Rech arrived. As soon as Mrs. Rech saw the parents leave the apartment, she forced her way into the apartment and after searching from room to room finally located Miss Budin in the bathroom. The parents returned within a few minutes and all parties concerned discussed the situation. There was absolutely no evidence of any improper conduct on this occasion between Miss Budin and Arnold G. Rech. It may have been indiscreet for the parents to have left their 29 year old daughter alone in the apartment with Mr. Rech for a few minutes while the daughter was taking a bath but the parents had met Mr. Rech many times and they thought they knew with whom they were dealing.

"As Mrs. Alice Budin, the mother, stated (on page 375 of the Record) in explaining why she and her husband left the apartment at the time:

" 'Q. What did you and your husband do after he arrived?

" 'A. Well, when Arnold came in I had had a scarf around my head and my coat on. We were being sponsors for this little child and I had a cold and hadn't been down to see the child, and we were standing on Sunday for this child, so I asked Arnold please to excuse us because I had my coat and hat on. We were all ready to go but in our house we think clean and we live clean.'

"The master was greatly impressed by the demeanor of Roberta Budin and of her mother, Alice Budin, when on the stand regarding the incident of November 16, 1951. There was sincerity and truthfulness in their hearing and the master accepts their version of what happened on November 16, 1951."

The master said that the wife failed to prove recrimination. The appellee, nevertheless, argues that

the evidence should persuade us that appellant was guilty of adultery.

The Divorce Law of May 2, 1929, P. L. 1237, §52, 23 PS §52 provides:

"In any action or suit for divorce for the cause of adultery, if the respondent shall allege and prove, or it shall appear in the evidence, that the libellant has been guilty of the like crime, or has admitted the respondent into conjugal society or embraces after he or she knew of the criminal fact, or that the said libellant (if the husband) allowed the wife's prostitution, or received hire from it, or exposed his wife to lewd company whereby she became insnared to the crime aforesaid, it shall be a good defense and a perpetual bar against the same."

"Since the statutory defense of recrimination is based upon the commission of adultery by the libellant, the burden is on the respondent to prove it (citing). The evidence necessary to prove recrimination must have the same degree of certainty necessary to establish the existence of the charge of adultery against the respondent." *Isaacs v. Isaacs,* 149 Pa. Superior Ct. 508, 512, 27 A. 2d 531 (1942).

Appellee quotes the frequently repeated rule set forth by Chief Justice GIBSON in *Matchin v. Matchin,* 6 Pa. 332, 338 (1847) as follows: "It is a fundamental rule, said Lord Stowell, in Loveden v. Loveden, 2 Haggard, 2, that it is not necessary to prove the direct fact of adultery; for, being committed in secret, it is seldom susceptible of proof except by circumstances which, however, are sufficient whenever they would lead the guarded discretion of a reasonable and just man to a conclusion of guilt."

The statement that "it is not necessary to prove the direct fact of adultery" needs examination, for taken out of context it is misleading. It should be here em-

phasized that a person can be guilty of adultery in a divorce action only if the fact finder is convinced by a preponderance of the evidence that the accused committed adultery. In the above quoted statement Chief Justice GIBSON was calling attention to the fact that adultery can seldom be proved by direct evidence, and therefore of necessity must and can be proved by circumstantial evidence;—"circumstances which . . . would lead the guarded discretion of a reasonable and just man to a conclusion of guilt."

In *Connor v. Connor*, 168 Pa. Superior Ct. 339, 345, 77 A. 2d 697 (1951) this court said:

"The charge of adultery is a serious one, and the proofs must be clear and satisfactory, established by 'clear proofs of imperious reasons', and 'must be of such a clear and convincing character as to leave no other conclusion in the mind of a reasonable person'; (citing)"

We agree with the master that the evidence in this case was not sufficient to convict the appellant of adultery. In *Brobst v. Brobst*, 171 Pa. Superior Ct. 499, 90 A. 2d 320 (1952); *Brown v. Brown*, 121 Pa. Superior Ct. 74, 183 A. 90 (1936); and *Hilton v. Hilton*, 66 Pa. Superior Ct. 378 (1917), cases cited by the appellee, there was much more convincing evidence than here.

The master, although not convinced of appellant's guilt of adultery, nevertheless found it impossible to call him an "innocent spouse" in view of his "indiscreet relations" with Roberta Budin;—"a married man . . . ardently courting a young woman . . . usually leaving the home of his girl friend at very early hours in the morning."

No authority was cited by the master for such conclusion, and for one very good reason—it is not the law.

No two divorce cases are ever exactly alike, but this case is so similar to *Newman v. Newman,* 170 Pa. Superior Ct. 238, 244, 85 A. 2d 613 (1952) that we feel it is governed by the reasoning and principles of law set forth there by Judge Ross. It was there said: "There is, of course, the requirement that the plaintiff in a divorce action qualify as the 'innocent and injured spouse' (Act of May 2, 1929, P. L. 1237, sec. 10 as amended, 23 PS 10); but this does not mean that the plaintiff must be wholly free from fault."

In the case before us, the defendant having been found guilty of adultery, the plaintiff is an "innocent and injured spouse" unless the evidence shows he was guilty of adultery, cruel and barbarous treatment or indignities, in other words conduct which would have entitled the defendant to a divorce from the plaintiff had she been an innocent and injured spouse. That plaintiff's conduct may have been "indiscreet" or "suspicious" is not sufficient. Neither would it be sufficient if he were guilty of acts of indignities and cruelty which were not of sufficient severity to entitle the defendant to a divorce on such grounds.

The rule that the plaintiff may be denied a divorce on the basis of conduct which may fall short of grounds of divorce has developed in and been applied to cases of indignities. *Richards v. Richards,* 37 Pa. 225 (1860); *Daly v. Daly,* 137 Pa. Superior Ct. 403, 9 A. 2d 192 (1939); *Hartley v. Hartley,* 154 Pa. Superior Ct. 176, 35 A. 2d 591 (1943); *Goshorn v. Goshorn,* 163 Pa. Superior Ct. 621, 63 A. 2d 135 (1949). See also *Grove's Appeal,* 37 Pa. 443 (1860). It is not applied in adultery cases. *Newman v. Newman,* supra.

When both parties to a divorce action are charged with adultery it is of course possible that the evidence against one is more convincing than that against the other, or that one's guilt has been more frequent or

more flagrant than the other's. But the guilt of one cannot be weighed against the guilt of the other. Neither is there such a thing as one being "almost guilty" or "a little bit guilty" of adultery. The fact finder must always decide whether the evidence convinces him of the guilt of each party or not. Having found here that the wife was guilty of adultery and the husband was not, he should have recommended and the court should have granted a divorce to the husband.

The order refusing the divorce is reversed, and the record is remitted to the court below with direction to enter a decree of absolute divorce to the appellant on the ground of adultery.