Rinker Appeal.

144

Argued September 30, 1955.  Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Richard W. Linton,* for appellant.

*R. Merle Heffner,* District Attorney, for appellee.

OPINION BY WOODSIDE, J., November 16, 1955:

This is an appeal from the order of the Court of Quarter Sessions of Huntingdon County sitting as a Juvenile Court in which it declared the appellant's three children neglected, and directed them committed to the care and custody of the Huntingdon County Child Welfare Services.

The mother, who has taken this appeal, questions the sufficiency of the evidence to warrant the action of the court.

A petition to have the children declared "neglected" was filed in the Juvenile Court by a child welfare worker.  The court ordered that the case be heard Jan-

uary 19, 1955 at which time the testimony of a number of witnesses was taken. After the hearing the learned Judge "determined" that the best interests of the children required their care, guidance and control and committed them to the care and custody of the Welfare Services.

As provided in section 15 of the Juvenile Court Law of June 2, 1933, P. L. 1433, 11 PS §257, upon petition of the mother the court granted a review and rehearing. At the rehearing the court admitted the testimony taken at the previous hearing and heard additional witnesses.

There was no error in this procedure. *Weintraub Appeal,* 166 Pa. Superior Ct. 342, 71 A. 2d 823 (1950).

The procedure provided by the above section of the Juvenile Court Law for a rehearing is unusual, but its purpose is evident. To avoid the atmosphere and the formality of a courtroom the legislature established a separate court and procedure to deal with children. The informality of the procedure has much to do with its value, and this informality is generally followed by juvenile court judges and is encouraged both by the legislature and the appellate courts. This informality, however, makes it impossible to present to an appellate court a record that can be intelligently reviewed.

In order to provide a proper record for review when appeals are taken the legislature provided for the "review and rehearing" which the lower court *must* grant when requested within 21 days of the final order and which requires that the testimony be taken down and transcribed by an official court stenographer. The final order from which an appeal may be taken to this Court is based upon the record made at the rehearing.

In the instant case the mother was present at the first hearing; she was represented by counsel who examined and cross-examined witnesses; an official court

stenographer took down and transcribed the testimony. Under these circumstances it was proper to admit the transcript of this testimony into evidence at the rehearing as a part of the record of the rehearing. *Weintraub Appeal,* supra. Both the petitioner, who was represented by the District Attorney, and the mother of the alleged neglected children had a right to offer additional testimony at the rehearing. Both did.

On the basis of the evidence thus submitted the court made certain findings of fact upon which it based its final order of June 22, 1955. The court found that the children were neglected, and that the mother neglected to provide the proper care necessary for the morals and well being of the children and it ordered them committed to the care and custody of the welfare agency. We are of the opinion that the evidence did not warrant this action.

Section 1 of the Juvenile Court Law, supra, 11 PS §243, provides, inter alia, as follows:

"(5)   the words "neglected child" include:

. . .

"(b)   A child who lacks proper parental care by reason of the fault or habits of his or her parent, guardian, custodian or legal representative;

"(c)   A child whose parent, guardian, custodian or legal representative neglects or refuses to provide proper or necessary subsistence, education, medical or surgical care, or other care necessary for his or her health, morals or well-being;"

The family is an institution which preceded governments. Its sanctity was universally recognized before judges or statutes or constitutions or welfare organizations were known to man. The right of a child to a mother and a mother to a child are rights created by natural law. They are rights attributable to the

nature of mankind rather than to the enactments of law.

It is a serious matter for the long arm of the state to reach into a home and snatch a child from its mother. It is a power which a government dedicated to freedom for the individual should exercise with extreme care, and only where the evidence clearly establishes its necessity. Yet, of course, there are cases where such authority must be exercised for the protection and welfare of children.

Under our system of government children are not the property of the state to be reared only where and under such conditions as officials deem best. On the other hand the state is interested in establishing a minimum standard of care for a child's physical, intellectual and moral well being. But this minimum standard must be viewed in the light of experience. Although there are many very good homes, there is no such thing as a "perfect home."

A child cannot be declared "neglected" merely because his condition might be improved by changing his parents. The welfare of many children might be served by taking them from their homes and placing them in what the officials may consider a better home. But the Juvenile Court Law was not intended to provide a procedure to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.

The power of the juvenile court is not to adjudicate what is for the best interests of a child, but to adjudicate whether or not the child is neglected. *Rose Child Dependency Case*, 161 Pa. Superior Ct. 204, 208, 54 A. 2d 297 (1947).

Much of what we have said above was contained in the opinion of President Judge HIMES of the lower court, some in almost the same language. Where we differ with the court below is not so much on the principles involved but in their application to the evidence.

The fact that the state is supporting the children does not take away from the mother any rights which she would have to the custody of the children were she supporting them from her own resources.

In habeas corpus cases involving the custody of children the contest is between two people usually parents or relatives. It seldom involves people who have not been at some time in a parental relationship to the child. In these cases the government acts as an arbiter between the parties and determines with whom the child's interests will best be served.

An action to have a child declared neglected is a contest between the state and the parent or person having custody of the child. The state becomes both arbiter and party. In order that justice may be done, it is necessary that juvenile court judges exercise their power with caution, for the restraint that is upon them is limited largely to self restraint.

It is because of this distinction between habeas corpus and neglected cases that the Supreme Court may have pronounced the apparently inconsistent rules of *Com. ex rel. Harry v. Eastridge,* 374 Pa. 172, 97 A. 2d 350 (1953); and *Ciammaichella Appeal,* 369 Pa. 278, 85 A. 2d 406 (1952).

In the *Eastridge* case the Supreme Court held that an appellate court is not free to nullify the fact-finding function of the hearing judge *in a habeas corpus case,* and that in such case the credibility of witnesses and the weight to be given to their testimony can best be determined by the judge before whom they appear.

150

In the *Ciammaichella Appeal* the Supreme Court held that the Superior Court should not limit its review *in a neglected case* but should exercise its independent judgment after consideration of the entire record. "Obviously," it was there said, "its (the Superior Court's) scope extends to the fullest review consistent with equitable principles.", p. 281.

We perceive that as one of these cases was a habeas corpus and the other a neglected case, the rule relating to the scope of review in the *Ciammaichella Appeal* was not reversed by the *Eastridge* case. But even if we were to limit our review in this case to the scope imposed upon us by the *Eastridge* case we would reach the same conclusion.

An examination of the record in this case shows that the evidence of the Commonwealth is not seriously disputed. The determination of this matter depends upon the inferences to be drawn from the evidence rather than the credibility of the witnesses.

The children in question Terry, 12, Harry, 10, and Nancy, 9, have been residing with their mother. The father's whereabouts are unknown, he having deserted his family seven years ago. The mother is receiving public assistance. During the fall of 1954 the mother became seriously ill and was under treatment in the hospital several months for an internal condition from which she probably has not recovered. There is no evidence to indicate that these children were neglected prior to their mother's confinement in the hospital.

Mr. and Mrs. Carl Edward Miller, in-laws of the appellant, had Terry for several years but the mother took him back to her home. While she was in the hospital the Millers kept all the children. Mr. Miller is a bartender at the Moose Hall; Mrs. Miller does not work; they have no children; they live in the country and own a television set; the children like it there. The

learned trial judge considers them proper people to have custody of Terry.

When the mother was discharged from the hospital she took her children home. The evidence, even of the petitioner's or Commonwealth's witnesses, establishes that the mother kept the children clean, that they were in good health, that their school work and attendance was satisfactory, that they attended Sunday School and that through the mother's efforts Terry attended a Methodist Church Camp during at least two summers where he was a "good camper." Terry was also described as mannerly and dependable by a Commonwealth witness for whom he did odd jobs.

That does not sound like neglect by a mother who has been compelled to rear three small children on a public assistance allowance for seven years since her husband deserted her.

But the mother's conduct is not above reproach. Occasionally she gets drunk, and she accepts with impropriety the attentions of two married men. We shall examine the evidence as to these shortcomings.

This action seems to have been precipitated by the events which took place January 9, 1955. That night the mother had borrowed a car and went to a drinking establishment. There she met one of the men with whom she had been "keeping company." When she left, he got into the car with her. When she ordered him out he beat her severely, after which she drove away without him. Becoming ill she stopped along the road where she was found by the police who had been notified of her condition by a passing truck driver. So badly was she beaten that she was required to stay in the hospital several days.

There was some evidence that the children were late for school on several occasions, but from the Commonwealth's own witnesses it appears that this was not

while the children were living with the mother, but while they were living with the Millers.

There was evidence at the first hearing that the cars of the two married men were frequently parked in the vicinity of the appellant's home, and that on several occasions one of the men became intoxicated in her home.

With the exception of the Millers, who had no complaints about the home, not one of the Commonwealth witnesses at the first hearing was ever in the appellant's house; not her sister Ann, who visited next door several times a week, drove by to see whether there were any cars parked near her home, and looked in the windows to see who was there; not the neighbor who saw the children playing in the alley, and who alone of all the witnesses, thought they were dirty; not the welfare worker who first learned of the case when she went to the hospital to get the mother to give the Millers more money for keeping the children while she was in the hospital.

There was very little testimony presented at the first hearing concerning the neglect of these children, and the learned trial judge did not declare the children neglected at that time. Although technically he had no jurisdiction to supervise the children without finding them neglected, he is not to be criticized for making an effort to assist the mother in providing a better home for the children by urging her to discontinue all improper conduct.

The week after the first hearing the probation officer called at the appellant's home at 6:30 in the evening, found her doing the dishes and the children playing in the kitchen. Two days later he called at 10:30 P.M., and found her asleep on a living room chair and the children in bed. In each succeeding week for a month he called and "found everything normal." On

some occasions he went around the neighborhood looking for appellant's friends' cars and at least once looked in the window but did not stop. He found nothing improper or suspicious on any of these visits.

On March 18th he called at 10:30 A.M. He saw one of her male companions leave by the front door as he went into the house by the back door, and, because the appellant did not answer the knock promptly, he assumed she and her friend had been upstairs, and because it had snowed the previous night, and there was snow on the windshield of her friend's car he assumed he had been there all night. The appellant admitted her friend had been at her home the previous evening for a half hour, but said he had left and had come back the following morning.

On March 29th, the probation officer in response to a telephone call went to appellant's home and found the children in bed and alone. It developed, however, that before leaving that afternoon to visit a sick sister in Chambersburg the appellant arranged with another sister living next door to have the children fed and put to bed.

Attached to the brief of the district attorney is printed a statement of one of appellant's male companions taken not in open court but before the district attorney, a probation officer and a stenographer, only a few days before the argument. It is not a part of the record; it was not sworn to; it was not taken in the presence of the appellant or her counsel; the maker was not subject to cross-examination. It should not have been given to us, and we have not considered it.

One of the welfare workers testified to the remarks and stories of the neighbors. It was generalized hearsay gossip, which we are required to ignore.

The lower court admitted testimony of what the

children had told other people, not "for the purpose of establishing the truth of existence of the matters stated by the children" but "to establish what was in the minds of the children, and the impact upon the children of the mother's conduct." Its use thus limited, the evidence was properly admitted at the Juvenile Court hearing.

If these children are to be found neglected it must be solely on the basis of the mother's use of alcohol to excess and her association with the two men to whom we have referred.

Although deserted more than seven years ago, the appellant is not divorced. The evidence creates a suspicion that she has committed adultery with one or both of her two friends. It is insufficient, however, to warrant a holding by the court that she has. *Brower v. Brower,* 157 Pa. Superior Ct. 426, 43 A. 2d 422 (1945) ; *Baxter v. Baxter,* 147 Pa. Superior Ct. 207, 24 A. 2d 15 (1942) ; *Rech v. Rech,* 176 Pa. Superior Ct. 401, 107 A. 2d 601 (1954) ; *Viale v. Viale,* 109 Pa. Superior Ct. 560, 167 A. 437 (1933).

Even if she did commit adultery, that *alone* does not warrant taking her children away from her. *Com. ex rel. McMenamin v. McMenamin,* 171 Pa. Superior Ct. 524, 90 A. 2d 398 (1952) ; *Com. ex rel. Bock v. Bock,* 159 Pa. Superior Ct. 159, 48 A. 2d 133 (1946).

Of course, it is possible for a parent to establish such an immoral atmosphere about a home that it amounts to legal neglect. The morals of a child are affected by that which he is allowed to observe and hear as well as by that which he is taught. In a neglect case the question is not whether a parent is a law violator or uses alcohol to excess, but whether intemperate and immoral conduct of the parent creates such deficiencies in the parental care of the child as to require separating him from his parent.

The appellant is unwise in the choice of her companions. They are married men and they beat her. Her children do not like them. Her conduct is not to be condoned, but under the evidence it does not warrant a finding that her children are neglected.

It is unfortunate that the mother uses intoxicating beverages to excess. She should not do it, and indirectly it is likely to have some demoralizing effect upon the children. There is no evidence, however, that while drinking she ever has abused or mistreated her children. Nor does the evidence show that it is a regular or frequent failing. There is no evidence that the children have ever seen her under the influence of liquor. There is no evidence that she was intoxicated during the months between the hearings.

There is an intimation that the children are neglected because the mother leaves them alone in the house while she goes to drinking places. The time the mother was beaten by her companion the children were being kept by her brother. There was evidence that she was not home over the lunch hour of the day before the first hearing. She went to see her lawyer and then went for a ride with one of her friends, returning in the afternoon by the time the children returned from school. She had asked her sister to care for the children over the noon hour. The time the probation officer was called at 10 o'clock at night the appellant had arranged with her sister, who lives on the other side of her double house, to give the children their supper and put them to bed. These three were the only specific incidents, when the children were home during the mother's absence, to which reference was made by the witnesses.

The appellant testified at the first hearing that since she had come home from the hospital she had

been away from the house while the children were home not over a half dozen times.

Considering the way she was being watched by her sister, the welfare worker and the probation officer, as well as others, the probabilities are that her absence from the children after the hearing would have been quickly detected and reported. As a matter of fact the day she went to Chambersburg, her sister Ann, the probation officer and the welfare worker all knew before she returned home that she had been away.

As the record now stands there is no evidence of any specific time that she left the children alone without making provisions for their care.

It is our opinion that too much emphasis was placed upon the mother's conduct away from, and unrelated to, her relations with her children. Although there was some evidence to show the effect of her friends' visits upon the children, most of the evidence had to do with her conduct away from the home and the children.

There is evidence that the youngest child is below average mentally. Such child may need care beyond that required by a normal child. The legislature has recognized this in its definition of a neglected child in section 1 of the Juvenile Court Law, supra, which provides, inter alia: "The words 'neglected child' include: ... (d) A child whose parent, guardian, custodian or legal representative neglects or refuses to provide the special care made necessary by his or her mental condition;" 11 PS §243 (5) (d). If the testimony should warrant it, the Juvenile Court could find that the youngest child is neglected and the other two are not.

Since the argument in this case, we have been informed that the appellant was sentenced for disorderly conduct arising out of her being intoxicated, and neither friend nor relative having paid her fine she was imprisoned. This came to the attention of this Court

because a supersedeas had been issued and the District Attorney fearing the officials would be in contempt of this Court by placing custody of the children away from the mother while she was incarcerated, advised our President Judge of the situation.

We think there was insufficient evidence in this case to support a finding that the children are neglected. We are of the opinion, however, that we should not discharge the petition but should return the case to the lower court for further consideration.

The lower court may either discharge the petition or take additional testimony relating to the neglect of the children. Evidence of events either before or subsequent to the last hearing may be admitted, and officially transcribed. If in the light of this opinion and any additional evidence which may be taken, the court finds that the children, or any of them, are neglected it may make an order accordingly. An appeal from such order would lie to this Court without the intervention of a rehearing.

The record is returned to the court below for action not inconsistent with this opinion.