[J-79A-2022 and J-79B-2022] [MO: Dougherty, J.]

**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.T., A MINOR | : | No. 37 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: K.T. | : | Superior Court entered June 2, 2022 |
| | : | at No. 1245 WDA 2021, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas Allegheny County entered |
| | : | October 13, 2021 at No. CP-02-AP- |
| | : | 197-2019. |
| | : | |
| | : | ARGUED: November 29, 2022 |
| | | |
| IN THE INTEREST OF: K.T., A MINOR | : | No. 38 WAP 2022 |
| | : | |
| | : | Appeal from the Order of the |
| APPEAL OF: ALLEGHENY COUNTY | : | Superior Court entered June 2, 2022 |
| CHILDREN, YOUTH AND FAMILIES | : | at No. 1279 WDA 2021, affirming |
| | : | the Order of the Court of Common |
| | : | Pleas of Allegheny County entered |
| | : | October 13, 2021 at No. CP-02-AP- |
| | : | 197-2019. |
| | : | |
| | : | ARGUED: November 29, 2022 |

## DISSENTING OPINION

**JUSTICE WECHT**                                  **DECIDED: JUNE 21, 2023**

Today, the Majority provides a new four-factor test[1] for trial courts to use when

conducting needs and welfare analyses under 23 Pa.C.S. § 2511(b) of the Adoption Act.

As part of that test, the Majority adopts a standard for evaluation of parent-child bonds in

termination of parental rights cases that the plain language of the Adoption Act does not

support. The Majority's new rubric also violates this Court's tradition of affording trial

---

[1]     *See infra* at 23-24.

courts discretion to assess children's needs and welfare holistically in making termination of parental rights decisions. Today's new standard for weighing the bond between the parent and child supplies a threshold that is amorphous and abstract. Even the Majority has trouble defining this new threshold. This rubric minimizes a child's relationship to a parent in most situations and restricts trial courts on the front lines from evaluating that relationship in conjunction with other considerations bearing upon the child's needs and welfare as they see fit. The threshold that the Majority attaches to a parent-child bond makes it easier for child welfare agencies to prove their cases, pre-tilts a trial court's decision toward termination of parental rights, minimizes a child's relationship to a parent in any case where there is a parent-child bond, and discounts the pain attendant to termination of that relationship as measured from the child's perspective. The Majority assumes that adoption is the solution for most children who cannot reunify with a parent, even though other permanency options exist. Until now, Pennsylvania law has allowed trial courts on the front lines to retain their discretion to evaluate each specific child in each specific case. Because the Majority departs from this path, I respectfully dissent.

Section 2511(a) of the Adoption Act first requires the petitioner to prove one or more of eleven specified grounds for terminating parental rights.[2] Only when the petitioner has done so may the court turn to Section 2511(b). That subsection, entitled "Other considerations," states, *inter alia*, that "[t]he court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child."[3]

---

[2]     23 Pa.C.S. § 2511(a).

[3]     23 Pa.C.S. § 2511(b).

In contrast to Section 2511(a), which focuses upon the parent's conduct, the plain language of Section 2511(b) requires courts to focus upon the child's needs and welfare. Even when a petitioner has proven grounds to terminate under Section 2511(a), "termination must be decreed only where it serves the needs and welfare of the children."[4] Stated plainly, even in circumstances where a parent's conduct might establish grounds for the termination of parental rights, severing the legal relationship between a parent and child does not necessarily serve the child's needs and welfare. Proof of grounds alone is necessary, but not sufficient; satisfaction of the needs and welfare analysis is required as well.

In the absence of statutory factors prescribing a methodology for trial court evaluation of whether termination of parental rights serves a child's needs and welfare, this Court has provided some direction. In *T.S.M.*,[5] this Court emphasized that the Section 2511(b) analysis must address "the needs and welfare of the particular children involved."[6] *T.S.M.* did not set forth a closed and complete list of mandatory factors that a court must consider when conducting a Section 2511(b) analysis. It would be impossible to fashion such a list inasmuch as each child's circumstances are unique. What *T.S.M.* does mandate is that the trial court consider whether the petitioner has proved that the

---

[4]     *In re E.M.*, 620 A.2d 481, 484 (Pa. 1993).

[5]     *In re T.S.M.*, 71 A.3d 251 (Pa. 2013).

[6]     *Id.* at 268-69. As I discuss below, *T.S.M.* involved five children who spent extended time in foster care, suffered from psychological and behavioral conditions, and had a strong but unhealthy bond to their mother. This Court referred to the children as "catastrophically maladjusted." *Id.* at 269. While this Court's discussion has broader implications for Section 2511(b), its analysis was targeted toward the circumstances of the children in that case.

termination serves the child's needs and welfare by "weighing . . . factors" that involve "contradictory considerations."[7]

*T.S.M.* explained that trial courts must consider, to the extent applicable and in addition to any other considerations bearing on a particular child's developmental, physical, and emotional needs and welfare, the following considerations: (1) a child's "emotional needs and welfare," which include "intangibles such as love, comfort, security, and stability";[8] (2) any "emotional bond" between a parent and child,[9] including (a) the nature of that bond, whether it is a healthy bond or whether the child's emotional attachment is derived from parental conduct that harms the children;[10] and (b) the effect of permanently severing the bond upon the child;[11] and (3) the child's permanency and security needs, including (a) whether a child is in a pre-adoptive home[12] with caregivers who provide necessary love, care, and stability;[13] (b) whether there is a strong likelihood of eventual adoption;[14] (c) whether a child has a bond with a foster caregiver;[15] (d) whether any unhealthy bond with a parent or the parent's actions are interfering with the

---

[7]     *See id.* at 269.

[8]     *Id.* at 267.

[9]     *Id.* at 268 (citing *E.M.*, 620 A.2d at 485).

[10]    *See id.* at 267-69.  This Court acknowledged that "evaluation of a child's bonds is not always an easy task," and recognized that a bond may be "strong" yet "unhealthy." *See id.*

[11]    *Id.* at 268.

[12]    *Id.*

[13]    *See id.* at 268-71.

[14]    *See id.* at 268, 270.

[15]    *Id.* at 268.

child's ability to bond with a foster parent or obtain stability;[16] (e) whether, to the extent that the child feels competing loyalty to a parent and foster caregiver, permanency could make the child feel more secure and resolve such conflict;[17] and (f) the length of time children have spent in foster care, bearing in mind the "ticking clock of childhood."[18] Overall, *T.S.M.* directed trial courts to pay "attention to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy," and to "weigh that injury against the damage that bond may cause if left intact."[19]

K.T. ("Child") was five years old when the trial court denied the petition filed by Allegheny County's Office of Children, Youth, and Families ("CYF") to terminate involuntarily the parental rights of Child's mother, K.S.T. ("Mother"). The dispute before us in this case centers upon the legal evaluation of Child's bond with Mother under

---

[16]    *See id.* at 268-70.

[17]    *See id.* at 270. Specifically, in explaining why the trial court abused its discretion in relying upon the children's bond with their mother and the children's lack of a guaranteed adoptive home in denying the termination petition, this Court admonished that "use of concurrent planning beyond its useful life can create confusion for the children and potentially increase the difficulty for them to bond with pre-adoptive parents." *Id.* In some scenarios, the child's bond to the parent who cannot care for the child interferes with the child's ability to bond to foster parents or causes the child to experience maladaptive behaviors. *See id.* To illustrate the complexity of these situations, this Court drew upon the expert psychologist's testimony to explain that courts should consider whether "the child is conflicted 'between loyalty to a biological parent and loyalty to a foster parent, pre-adoptive parent, [or] adoptive parent. When it is clear to the child that they are in their permanent home, then the conflict can diminish, which can result in less disruptive behaviors and a greater sense of security.'" *Id.* (citation omitted). The Majority critiques my inclusion of such a factor into the considerations that a trial court must consider. *See* Maj. Op. at 44 n.28. Yet this consideration was one of the many integral parts of this Court's analysis in *T.S.M.* The tenor of the Court's rationale in *T.S.M.* was to caution trial courts that evaluations of parent-child bonds and a child's developmental, physical, and emotional needs and welfare is a complex task.

[18]    *See id.* at 269.

[19]    *Id.*

Section 2511(b),[20] and whether that bond serves Child's needs and welfare to a sufficient degree that it overcomes the grounds for termination.

CYF removed Child from Mother's care when Child was eight months old. Child spent four years in kinship foster care with her godmother. No one disputes that there were grounds to terminate Mother's parental rights under Section 2511(a). Nor does anyone dispute that Child shares a bond with both Mother and the godmother. One needs no psychology degree to discern what common sense predicts: since Child has spent most of her life in her godmother's daily care, her relationships with her godmother and Mother are significantly different. Unsurprisingly, by this point, Child's primary attachment is to her godmother, who is Child's source of emotional security.

While Mother's progress in meeting the goals set by CYF to reunify with Child has waxed and waned, her interest in Child never has. Mother attended most of her visits with Child. For a time, Child visited Mother's home overnight on an unsupervised basis. At other times, visits occurred under supervision. During most of Child's time in foster care, Child and Mother visited each other three times per week.[21] Although Child was in Mother's direct care for only a brief time following birth, the trial court determined that Child had formed and maintained a bond with Mother. The parties in this case do not dispute the existence of that bond. This dispute centers upon competing interpretations of the nature of the bond, the effect upon the child of severing it, and the bond's overall place within the Section 2511(b) analysis.

The trial court declined to terminate Mother's parental rights. Child and CYF appealed. In its Pa.R.A.P. 1925(b) opinion, the trial court indicated that the petitioner,

---

[20]     See 23 Pa.C.S. § 2511(b); see also E.M., 620 A.2d at 481-84 (requiring an evaluation of the parent-child bond as part of the Section 2511(b) analysis); T.S.M., 71 A.3d at 268 (same).

[21]     See N.T., 3/22/21, at 126-27; N.T., 5/13/21, at 34.

CYF, did not meet its burden of proving that termination met Child's needs and welfare under 23 Pa.C.S. § 2511(b). The trial court highlighted the evidence in the record which demonstrated that permanently severing Mother and Child's emotional relationship would "adversely affect" Child.[22]

A divided panel of the Superior Court affirmed the trial court's order. The panel majority rejected the notion that the trial court applied an incorrect legal standard to evaluate Child's needs and welfare.[23] From the majority's perspective, Child and CYF simply disagreed with the trial court's discretionary weighing of the evidence. The panel majority acknowledged the "abundant evidence" in the record that "Child's needs and welfare may best be served by a life in [her godmother's] home."[24] But, the majority noted, there also was record evidence that Mother is "nurturing," "affectionate," and "playful" with Child, that Child looks forward to seeing Mother, and that continued contact with Mother, "if it could be shaped into a supportive role" that was not "critical" of Child's godmother,

---

[22]     *See* Trial Ct. Op., 11/22/21, at 15-19.

[23]     *See Interest of K.T.*, 281 A.3d 1040, 2022 WL 1793083, at *5 (Pa. Super. 2022) (non-precedential decision). According to the panel majority, a trial court may, but is not required to, emphasize a child's relationship with a foster caregiver. The panel declared that, while a trial court may emphasize a child's relationship with a foster parent, the Superior Court has not required the trial court to do so. *Id.* (citing *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011) ("[I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and *should* also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.") (emphasis added)). *But see T.S.M.*, 71 A.3d at 268 ("Common sense dictates that courts considering termination *must* also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.") (emphasis added).

[24]     *K.T.*, 2022 WL 1793083, at *5. The Superior Court found sufficient evidence to support the conclusion that Child's "primary attachment" is to her godmother, Child and her godmother share a strong positive bond, and Child's godmother has helped Child achieve stability, security, safety, and developmental and emotional success. *Id.* at *4-5.

would be "worth preserving" for Child.[25] Per this Court's recent decision in *S.K.L.R.*, which reiterated that the Superior Court cannot reverse a trial court's order merely because the record would support the opposite result,[26] the majority declined to find that the trial court abused its discretion.[27]

Child and CYF jointly filed a petition for allowance of appeal. They argued that the trial court erred as a matter of law by ignoring aspects of Child's needs and welfare beyond a parent-child bond[28] and by using a standard of "adverse effect" to evaluate Child's bond with Mother.[29] Child and CYF argue that an "adverse effect" standard is too lenient as a matter of law. They posit that lower courts across the Commonwealth uniformly must utilize a more exacting standard when called upon to evaluate a bond between a child and parent.[30]

---

[25] *Id.* at *4-6. Because the CYF caseworker had never seen Child and Mother interact in person, most of the evidence regarding Child's relationship with Mother came from Neil Rosenblum, Ph.D., a forensic psychologist who evaluated the family. *See id.* at *3. While Dr. Rosenblum recommended that Child have continued contact with Mother, his ultimate recommendation was that such contact should not come at the expense of Child's permanency with her godmother. *See id.* at *5.

[26] *See Interest of S.K.L.R.*, 256 A.3d 1108, 1127-29 (Pa. 2021) (emphasizing that appellate courts must defer to trial courts' factual determinations because of the latter's "first-hand observations of the parties spanning multiple hearings" and experience "on the front lines assessing the credibility of witnesses and weighing competing and often challenging evidence").

[27] *Interest of K.T.*, 2022 WL 1793083, at *5. In contrast to the panel majority's refusal to find an error of law, Judge Murray dissented, opining that the trial court erred as a matter of law by considering only the parent-child bond and "ignoring Child's need for permanency." *Id.* at *8 (Murray, J., dissenting).

[28] Child's Br. at 24-26; CYF's Br. at 44-47.

[29] Child's Br. at 19-20; CYF's Br. at 33.

[30] *See* Child's Br. at 20; CYF's Br. at 33.

Today, the Majority declares that the "only" parent-child bond which warrants preservation is one that is "necessary and beneficial."[31] The Majority maintains that its test stems from the plain language of the Adoption Act and this Court's decision in *E.M.*,[32] and that it has merely "clarified the standard."[33] I am not convinced.

As the Majority observes, the legislature has provided few instructions to guide courts in weighing whether termination of a parent's rights serves a child's needs and welfare.[34] The statute includes three categories of "needs and welfare": "developmental," "physical," and "emotional." The General Assembly did not define the term "needs" or the term "welfare." "The lack of definition naturally complicates a plain-language analysis, but it hardly precludes one."[35] We may seek understanding elsewhere, including in dictionaries, which furnish insight into the common meaning of a term.[36]

Although courts typically refer to a child's "needs and welfare" as a joint package,[37] each of these words has a meaning of its own. Reference to a child's "needs" is a signal that the legislature intended the court to focus upon aspects that are "of necessity" to the

---

[31]     Maj. Op. at 36.

[32]     620 A.2d 481 (Pa. 1993).

[33]     Maj. Op. at 50.

[34]     *See* Maj. Op. at 29 ("Although subsection (b) itself does not specify a method for determining whether granting or denying termination best serves the child's needs and welfare. . . .").

[35]     *Reibenstein v. Barax*, 286 A.3d 222, 231 (Pa. 2022).

[36]     *See id.*; *see also* 1 Pa.C.S. § 1903(a) ("Words and phrases shall be construed according to . . . their common and approved usage . . . .")

[37]     *See, e.g., T.S.M.*, 71 A.3d at 267.

child.[38]  Defined in the singular,[39] a "need" is "a physiological or psychological requirement for the well-being" of a person.[40]  Or, as another dictionary puts it, to "need" is "to require something/somebody because they are essential or very important, not just because you would like to have them."[41]  A child's "welfare," on the other hand, connotes "the state of doing well especially in respect to good fortune, happiness, well-being, or prosperity."[42]  Put differently, "welfare" is "the general health, happiness and safety of a person."[43]

A synthesis of these definitions indicates that Section 2511(b) requires courts to ascertain whether termination of a parent's rights serves a child's "developmental," "physical," and "emotional" requirements—*i.e.*, needs—*and* a child's "developmental," "physical," and "emotional" well-being—*i.e.*, welfare.   By prescribing the terms "needs" and "welfare," the General Assembly has directed courts to examine the termination's effect upon domains that a child needs to survive and domains that help a child to thrive.

By shifting the focus from the parent's conduct to the child, and by directing courts to give "primary consideration to the developmental, physical and emotional needs and welfare of the child," the General Assembly has required a comprehensive and holistic

---

[38]     *Needs*,        Merriam-Webster        Dictionary,        https://www.merriam-webster.com/dictionary/needs (last visited June 13, 2023).

[39]     "The singular shall include the plural, and the plural, the singular."  1 Pa.C.S. § 1902.

[40]     *Need*,        Merriam-Webster        Dictionary,        https://www.merriam-webster.com/dictionary/need (last visited June 13, 2023).

[41]     *Need*,        Oxford        Advanced        Learner's        Dictionary, https://www.oxfordlearnersdictionaries.com/us/definition/english/need_1    (last    visited June 13, 2023).

[42]     *Welfare*,        Merriam-Webster        Dictionary,        https://www.merriam-webster.com/dictionary/welfare (last visited June 13, 2023).

[43]     *Welfare*,        Oxford        Advanced        Learner's        Dictionary, https://www.oxfordlearnersdictionaries.com/definition/english/welfare (last visited June 13, 2023).

examination of the effect of terminating parental rights upon a child across multiple domains of that child's life. The examination is child-focused. The General Assembly left open the question of *how* to evaluate a child's needs and welfare. Notably, the legislature did not expressly direct the trial court to examine the parent-child bond. The broad language of Section 2511(b) leaves ample room for this obvious and important consideration. So, at first glance, the Majority's attempt to target the child's requirements and the child's well-being by attaching the "necessary and beneficial" label to the bond seems reasonable. But the legislative command is for the court to give "primary consideration" to a child's "developmental, physical and emotional" requirements and well-being in "terminating the rights of a parent" (*i.e.*, making a termination decision). The General Assembly did not prioritize or limit consideration of a parent-child bond or any other particular consideration bearing upon termination, so long as the consideration relates to the child's "developmental, physical and emotional needs and welfare." It did not require each individual and distinct consideration to serve the child's requirements *and* well-being in order to count in the trial court's weighing; no, it is the ultimate result that must serve a child's needs and welfare. Consequently, the Majority's decision to attach nearly insurmountable weight to one (and only one) consideration under Section 2511(b) is not supported by the statutory language.

Nor does the Majority's analysis comport with our existing precedents, which have grappled at length with the competing interests at stake in termination cases. Consideration of a child's needs and welfare pre-dates the adoption in 1980 of express statutory language requiring such an analysis.[44] Even before the legislature converted the termination decision into a two-step analysis, this Court unequivocally mandated that, given the nature of the rights at stake, courts could not consider a child's needs and

---

[44]    *See In re Adoption of R.I.*, 361 A.2d 294, 299 (Pa. 1976).

welfare until *after* they considered whether the Commonwealth proved grounds for terminating parental rights. Government agencies bore this initial burden in order to ensure that they did not destroy families; these agencies were not free

> to take the children of the poor and give them to the rich, nor to take the children of the illiterate and give them to the educated, nor to take the children of the crude and give them to the cultured, nor to take the children of the weak and sickly and give them to the strong and healthy.[45]

In *William L.*,[46] this Court explained that, notwithstanding a parent's constitutional interest in parenting his or her child, once the Commonwealth proved grounds for termination by clear and convincing evidence,[47] the Commonwealth could "constitutionally intervene to protect the 'physical or mental well-being' of the child."[48] The Court remained cognizant that the parent is not the only one with an interest in continuing the parent-child relationship. The child also has an "important" interest in continuing this relationship, because severing "close parental ties is usually extremely painful."[49] The demanding standards of removal and termination of parental rights exist in order to

---

[45]     *Id.* at 298 (quoting *Rinker Appeal*, 117 A.2d 780, 783 (Pa. Super. 1955)).

[46]     *In re William L.*, 383 A.2d 1228 (Pa. 1978).

[47]     This Court did not officially adopt the "clear and convincing" evidentiary standard for all termination of parental rights cases until 1983, following the United States Supreme Court's decision in *Santosky v. Kramer*, 455 U.S. 745 (1982). *In re T.R.*, 465 A.2d 642, 644 (Pa. 1983) ("We hold that in all proceedings to involuntarily terminate parental rights, which are not yet final, the petitioner must prove the statutory criteria for that termination by at least clear and convincing evidence."). *In re T.R.* arose under the 1970 version of the Adoption Act, which did not impose an express two-step process like the 1980 act. Nevertheless, this Court has continued to follow *T.R.* after the amendment of the Adoption Act. The petitioner is not only required to prove grounds by clear and convincing evidence in accordance with *Santosky*, but also must prove that termination meets the child's needs and welfare by clear and convincing evidence. *E.M.*, 620 A.2d at 484-85.

[48]     *William L.*, 383 A.2d at 1236.

[49]     *Id.* at 1241.

protect the *family*, of which the child is a part, from "harmful and unwarranted state intrusion."[50]

Assessment of a child's need for a "stable home and strong, continuous parental ties" cuts both ways.[51] Where a parent has been unable to retain custody of a child and the "child has lived with one foster family for a considerable period of time," removing the child from the foster family, "or inflicting upon [the child] the fear that [the child] might be removed at any time," may "create psychological and emotional distress similar to that caused by [the child's] removal from [the child's] natural parent."[52] In such a circumstance, the parent's interest in parenting the child may yield to the child's interest; a child need not remain indefinitely in the "limbo of foster care or the impersonal care of institutions" in order to preserve a parent-child relationship that no longer exists.[53] When the interests of the parent and child conflict, the legislature "has constitutionally mandated that the interests of the weaker party, the child, should prevail."[54]

In 1980, two years after the *In re William L.* decision, the legislature amended and re-codified the Adoption Act. It was then that the General Assembly added Section 2511(b), which expressly required courts to consider the child's needs and welfare.[55] The

---

[50] *Id.*

[51] *Id.*

[52] *Id.*

[53] *Id.*

[54] *Id.* at 1236.

[55] At that time, Section 2511(b) instructed that "[t]he court in terminating the rights of a parent shall give primary consideration to the needs and welfare of the child." It was not until 1995 that the General Assembly added the "developmental, physical and emotional" descriptors. *Matter of Charles E.D.M., II*, 708 A.2d 88, 92 n.2 (Pa. 1988).

addition of Section 2511(b) was met with little fanfare by this Court, which did not consider the new statutory language until it decided *E.M.* in 1993.

*E.M.* involved a mother with intellectual disabilities who struggled to provide adequate care to her two sons, both of whom also were intellectually disabled. For six years, the county child welfare agency provided services to try to reunify the family, but the agency ultimately determined that reunification was not viable. The trial court ordered that the mother's rights be terminated.[56]

On appeal to the Superior Court, the mother argued that terminating her rights did not serve her children's needs and welfare in view of their shared parent-child bond. The eight-year-old and nine-year-old children were doing well with the stability provided by their foster home, but typically enjoyed visiting their mother. The nine-year-old child referenced having "two mommies and two daddies"—referring to his pre-adoptive foster parents, his mother, and his mother's live-in boyfriend—and expressed a preference to live with his foster parents. The eight-year-old child also referred to both sets of parents as "mommy and daddy." That child alternated between naming the foster parents and his mother and her boyfriend when asked where he preferred to live, once expressing a wish to live with both at the same time.[57] The Superior Court affirmed the termination, declaring that:

> [O]nce a parent is adjudged incompetent under section 2511(a) whereby family unity cannot be preserved, *but where adoption is imminent*, then there is no need to ascertain whether a beneficial bonding exists as between the natural parent and the children, nor whether additional factors counsel that continuing the relationship might otherwise serve the needs and welfare of the child.[58]

---

[56]    *E.M.*, 620 A.2d at 481-82.

[57]    *E.M.*, 584 A.2d 1014, 1017-18 (Pa. Super. 1991), *rev'd*, 620 A.2d 481 (Pa. 1993).

[58]    *Id.* at 1022 (emphasis in original).

Lest anyone think that the court disregarded evidence of the irretrievable loss of "what may be a present and continuing beneficial relationship with the natural mother," the court acknowledged that it was aware that it was doing precisely that, but opined that it was up to the "legislature to consider the propriety of this result."[59]

Judge Johnson dissented. In his view, because no one was advocating a return to the mother, "[t]he real issue [was] whether the benefits of change in legal status from foster care to adoption, weighed against the harm of taking [the m]other out of the children's lives, will serve the best interests of the children."[60] He argued that "adoption may advance an abstract kind of stability while at the same time undermining the children's needs and welfare."[61] He observed that "[t]he children are not confused or otherwise negatively affected by ongoing relationships with both sets of parents. Termination/adoption might simplify things for other parties but not for the children."[62]

This Court granted review. In considering whether the agency had met its burden, the Court found it striking that the agency's own expert witness, a psychologist, testified that the children shared a bond with their mother and that the expert could have better assessed the bond if she had conducted a joint evaluation of the children and their mother.[63] The Court held that, "[w]hile the fact that there exists some bond between [the mother] and the children would not *per se* block a termination of parental rights, it is at

---

[59]     *Id.* at 1023.

[60]     *Id.* at 1024 (Johnson, J., dissenting).

[61]     *Id.* at 1027 (Johnson, J., dissenting).

[62]     *Id.* (Johnson, J., dissenting).

[63]     The psychologist also recommended evaluating the children with their foster father. She had conducted an evaluation between the children and their foster mother and an individual evaluation of the children's mother. *E.M.*, 620 A.2d at 484.

least a factor that, according to [the agency's] own expert witness, should have been more fully explored."[64] The Court found that the agency did not meet its burden to show by clear and convincing evidence that termination met the needs and welfare of the children.

This Court also disapproved the Superior Court's statement that there is no need to evaluate a bond where a parent is adjudged incompetent and where adoption is imminent:

> We do not agree. It is clearly conceivable that a beneficial bonding could exist between a parent and child, such that, if the bond were broken, the child could suffer extreme emotional consequences. This is true regardless of whether adoption is imminent. To render a decision that termination serves the needs and welfare of the child without consideration of emotional bonds, in a case such as this where a bond, to some extent at least, obviously exists and where the expert witness for the party seeking termination indicates that the factor has not been adequately studied, is not proper.
>
> Whether the bond exists to such a considerable extent that severing the natural parent-child relationship would be contrary to the needs and welfare of the children is an issue that must be more fully explored by the evidence. Such an intense bond may exist with respect to one, both, or neither of the children. The existing record is simply inadequate in its treatment of this issue.
>
> The order of the Superior Court affirming the decree of the court of common pleas must, therefore, be reversed. The case will be remanded to the court of common pleas for a reevaluation of the needs and welfare of the children, taking into account whatever bonds may currently exist between the children and [their mother], as well as other factors having bearing upon whether termination is proper.[65]

The *E.M.* Court referenced "extreme emotional consequences" and "an intense bond," and also mentioned a bond existing "to such a considerable extent that severing the natural parent-child relationship would be *contrary to the needs and welfare of the*

---

[64] *Id.* at 485.

[65] *Id.* Notably, this Court did not address what those "other factors" might be.

*children.*"  This Court's reference to "extreme emotional consequences" undid the Superior Court's assumption that, once a court declares an incompetent parent unfit, and once presumptively loving and fit foster parents are waiting to adopt the children, then *a fortiori*, termination and adoption meet the children's needs and welfare.  In practice, the Superior Court had declared that the effect upon a child of severing a bond with a parent did not warrant further consideration as a matter of law.  This Court pointed out the fallacy of that assumption, particularly because the language of the Adoption Act required a separate analysis of children's needs and welfare.

*E.M.* underscores the importance of full evaluation of a child's needs and welfare, one that is based upon scrutiny of the parties actually before the court, rather than upon general assumptions.  It also stands for the proposition that the petitioner can meet its burden for showing that termination serves a child's needs and welfare notwithstanding a parent-child bond, as "some bonds would not *per se* block a termination," while also mandating that a court must fully evaluate the bond before severing it for purposes of facilitating an adoption.[66]

In 1995, the General Assembly amended Section 2511(b) and added three descriptors to the phrase "needs and welfare."  After the amendment, courts had to give primary focus to the child's "developmental, physical and emotional needs and welfare."[67] Because we must assume that the General Assembly did not intend for these three descriptors to be mere surplusage,[68] the addition of the descriptors indicates that the General Assembly requires a holistic assessment of these distinct aspects of a child's needs and welfare and does not permit the focus to aim only at one area.

---

[66]     *E.M.,* 620 A.2d at 485, 483.

[67]     *Charles E.D.M., II*, 708 A.2d at 92 n.2.

[68]     *See Commonwealth v. Peck*, 242 A.3d 1274, 1282 (Pa. 2020).

In *Charles E.D.M., II,* a case involving a parent's petition to terminate the rights of the other parent, the Court emphasized that Section 2511(b) requires courts to look at the effect of termination of parental rights upon the child, not the effect upon the adults in the child's life.[69]  In that case, the child's father and stepmother testified that terminating the rights of the child's mother would bring finality for the father and stepmother, but they did not produce evidence concerning the effect upon the child; hence, they fell short of their burden for purposes of termination.[70]

In *Charles E.D.M., II*, the mother did not wish to disrupt the children's family situation with their father and stepmother; she merely wanted to remain present in the children's lives through visitation.  This Court emphasized "the importance of a child's relationship with his or her biological parent," and opined that ongoing "contact will allow the children to continue to feel loved by their mother and receive her guidance and nurturing."[71]  Additionally, this Court noted that allowing some contact may ward off "the children's painful search for their biological mother as a teen or an adult and the emotional injuries caused by the separation."[72]  Thus, while this Court's decision in *Charles E.D.M., II* focused upon a termination of parental rights in a private family realm outside of the foster care system, it recognized that parents can add value to a child's life even when they are not in a caretaking role.

---

[69]   *Charles E.D.M., II*, 708 A.2d at 92-93.  *See also In re Adoption of Atencio*, 650 A.2d 1064, 1066-67 (Pa. 1994) (citing *E.M.* for the proposition that Section 2511(b) "requires the court to look to the effect of termination on the needs and welfare of the child involved").

[70]   *Charles E.D.M.,II*, 708 A.2d at 92-93.

[71]   *Id.* at 93.

[72]   *Id.* (citing Betty Jean Lifton, LOST & FOUND: THE ADOPTION EXPERIENCE (1988)).

Meanwhile, in the late 1990s, federal lawmakers decided that the pendulum had swung too far toward protecting parental rights at the expense of dependent children's well-being.[73] The United States Congress enacted the Adoption and Safe Families Act of 1997 (ASFA),[74] which provided financial incentives to states to "move children toward adoption in a timely manner when reunification proved unworkable."[75] Our General Assembly responded the following year by amending the Juvenile Act to comport with the federal legislation.[76] This Court later summarized the changes thus: "[f]ollowing ASFA, Pennsylvania adopted a dual focus of reunification and adoption, with the goal of finding permanency for children in less than two years, absent compelling reasons."[77]

Twenty years after *E.M.*, this Court decided *T.S.M.* There, the Superior Court had affirmed the trial court's decision to deny a petition to terminate the parental rights of a mother who had been involved with the child welfare agency for almost a decade due to a pattern of abuse and neglect. Several reunification attempts had been made, but all had failed. The mother's five children had experienced "significant psychological and

---

[73] *See In re Adoption of S.E.G.*, 901 A.2d 1017, 1019 (Pa. 2006) (describing how the system's sole focus on reunification contributed to failed reunification attempts, bouncing between foster homes, or placement in congregate care).

[74] Pub L. No. 105–89, 111 Stat. 2115 (1997).

[75] *S.E.G.*, 901 A.2d at 1019 (citing 42 U.S.C. § 671(a)(15)(c)).

[76] Prior to ASFA, the sole express purpose of the Juvenile Act was "[t]o preserve the unity of the family whenever possible." *S.E.G.*, 901 A.2d at 1019. After ASFA, the General Assembly added a second purpose: to "provide another alternative permanent family when the unity of the family cannot be maintained." *Id.*; 42 Pa.C.S. § 6301(b)(1).

[77] *T.S.M.*, 71 A.3d at 269; *see also* 42 Pa.C.S. § 6351(f)(9) (requiring juvenile courts to determine whether an agency has filed a termination of parental rights petition if a dependent child has been in placement for fifteen of the last twenty-two months).

behavioral problems," in part due to their "pathological" and "unhealthy bond" with her.[78] The children drifted between foster homes and other out-of-home settings, with some of the children experiencing as many as thirteen placements. At times, the mother overtly interfered with the children's adjustments to their foster caregivers. After the agency filed a petition to terminate the mother's parental rights, the trial court refused to do so based upon a finding that the mother and children maintained a "strong bond."

Upon review, this Court described the situation as "a Catch–22."[79] The mother's abusive parenting created pathological bonds, which could not be severed without additional pain to the children. Yet maintaining the bond kept the children tied to a parent who was not able to reunify with them and "stymied [the children] from forming healthy bonds with their foster families who could provide them permanency and, with it, well-being."[80] This Court unanimously concluded that the trial court's denial of termination was manifestly unreasonable because the trial court ignored "the substantial, possibly permanent, damage done to these children by the prolonged, unhealthy, pathological bond" with their mother.[81] Maintaining such a pathological bond with a parent who was not able to reunify with the children was particularly egregious because that bond negatively impacted "the children's ability to form attachments to foster families who could

---

[78]  *T.S.M.*, 71 A.3d at 253. The children underwent "thirty to forty [psychological] evaluations as [their dependency case] dragged on for the better part of a decade." *Id.* at 260 n.19. The final psychologist to evaluate the children and their mother described the bonds between them as "unhealthy" with "traumatic aspects." *See id.* at 260 n.18. According to the psychologist, such bonds may occur after abuse; because the child has to depend on the parent, the child "normalize[s] the dysfunctional behavior." *Id.* Thus, the child remains closely aligned with a parent even though the child simultaneously "fear[s] and love[s]" the parent. *Id.*

[79]  *Id.* at 266 n.26.

[80]  *Id.*

[81]  *Id.* at 271.

have provided the necessary love, care and stability that these children have so needed for the past decade."[82]

In arriving at that conclusion, we set forth considerations that courts must consider when evaluating a child's needs and welfare, as discussed above.[83] A few more observations concerning *T.S.M.* are instructive here. Significantly, although the *T.S.M.* children, through their guardian *ad litem*, asked the court to decide whether a "pathological bond is a bond that is necessary and beneficial" to a child,[84] the Court did not answer that question directly or incorporate such a concept into its analysis of the bond. Instead, this Court held that "attention must be paid to the pain that inevitably results from breaking a child's bond to a biological parent, even if that bond is unhealthy," and directed courts to "weigh that injury against the damage that bond may cause if left intact."[85] Stated differently, "[c]ourts must determine whether the trauma caused by breaking that bond is outweighed by the benefit of moving the child toward a permanent home."[86]

Although the *T.S.M.* Court acknowledged that the Adoption Act explicitly excuses agencies from pleading that an adoption was "presently contemplated" or that "a present intention to adopt exists," we also determined that "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents."[87] Notably, this Court left

---

[82] *Id.*

[83] *See*, *supra*, text accompanying nn. 7-19.

[84] *T.S.M.*, 71 A.3d at 262.

[85] *Id.* at 269.

[86] *Id.* at 253.

[87] *Id.* at 268.

the analysis open-ended.  We cautioned trial courts that "termination of parental rights generally should not be granted unless adoptive parents are waiting to take a child into a safe and loving home," although we allowed that "termination may be necessary for the child's needs and welfare in cases where the child's parental bond is impeding the search and placement with a permanent adoptive home."[88]

This Court recognized that "contradictory considerations exist as to whether termination will benefit the needs and welfare of a child who has a strong but unhealthy bond to his biological parent, especially considering the existence or lack thereof of bonds to a pre-adoptive family."[89]  Ultimately, *T.S.M.* did not prescribe any sort of bright-line test or mandate regarding a parent-child bond, other than requiring trial courts to evaluate the nature and health of that bond and the effect of severing it, and to weigh those considerations as part of the greater needs and welfare analysis.  Thus, even in a case of an unhealthy parent-child bond that harms the child, this Court permitted trial courts to weigh the damage attendant to breaking the bond against the damage associated with leaving it intact.

The Court implicitly put its proverbial thumb on the side of ASFA's "permanency" mandate by cautioning trial courts to "keep the ticking clock of childhood ever in mind" and to maintain "vigilance to the need to expedite children's placement in permanent, safe, stable, and loving homes."[90]  However, the Court intentionally left the weighing of the aforementioned competing considerations open-ended, in view of our preference not to apply "the law regarding termination of parental rights . . . mechanically but instead

---

[88]    *Id.*  at 269.

[89]    *Id.* at 268.

[90]    *Id.* at 269.

always with an eye to the best interests and the needs and welfare of the particular children involved."[91]

The foregoing discussion of this Court's case law reveals that the Majority in the instant case is not merely "clarifying" a legal standard. Rather, today's Majority is, in fact, imposing a legal standard previously unrecognized by this Court. Although the *T.S.M.* Court unanimously determined that the trial court abused its discretion in that case, it did so only after formulating a needs and welfare analysis that affords ample discretion to a trial court in the first instance. Here, however, the Majority actually restricts the trial court's discretion even as it professes to recognize it.

The Majority summarizes the factors that comprise a "Section 2511(b) inquiry" by offering the following list:

> (1) whether the child and parent share a "necessary and beneficial" bond;
>
> (2) "the child's need for permanency and length of time in foster care consistent with 42 Pa.C.S. § 6351(f)(9) and federal law ASFA, 42 U.S.C. §§ 675(5)(C), (E)";
>
> (3) "whether the child is in a preadoptive home and bonded with foster parents"; and
>
> (4) "whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability."[92]

---

[91]     *Id.* at 268-69.

[92]     Maj. Op. at 42-43. The Majority's test queries whether the *foster caregivers* meet a child's "intangible needs of love, comfort, security, safety, and stability," but does not direct the trial court to consider whether the child's *parents* meet these intangible emotional needs of the child. *Id.* The direction in *T.S.M.* is to examine these intangibles generally. *See T.S.M.*, 71 A.3d at 267. The trial court should be examining the source of these intangibles for the child, regardless of the identity of the adult from which they emanate.

The Majority proclaims that all four of these factors are of "'primary' importance" and that all "may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare."[93]  But the Majority proceeds promptly to contradict itself, declaring that "*only* a necessary and beneficial bond . . . should be maintained," thereby imposing a universal threshold for the type of bond the Majority deems worthy of preservation.[94]  If trial courts truly maintain the discretion to "place appropriate weight on each factor present in the record,"[95] then they should be able to balance *any* parent-child bond among the other factors and evaluate each child's developmental, physical, and emotional needs and welfare as a whole.

The Majority's quest for a uniform legal standard regarding evaluation of a parent-child bond runs headlong into to the discretion that we afford trial courts in considering a child's individual circumstances.  Consider this incongruent result of the Majority's rubric: a trial court may weigh only a "necessary and beneficial" parental bond against the other factors, but it must consider *any* degree and quality of bond existing between a child and foster caregivers.  Indeed, under the Majority's newly formulated needs and welfare analysis, a trial court risks being overturned on appeal if it denies a petition to terminate parental rights based upon the child's beneficial bond with a parent that an agency witness declares to be unnecessary, even if the trial court believes that continued contact with the parent serves the child's developmental, physical, and emotional needs and welfare and there was an alternate route to permanency for the child.

---

[93]     Maj. Op. at 35-36.  *See also id.* at 43 ("Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.").

[94]     *Id.* at 36 (emphasis added).

[95]     *Id.* at 43.

Another problem is that the Majority's scheme is at odds with *T.S.M.*'s express directive that trial courts weigh the pain of breaking a strong but unhealthy bond against the damage of leaving the bond intact. In such a situation, the bond may not be beneficial, but it may nonetheless be necessary to the child insofar as the pain of severing it would be so traumatic that it trumps all other considerations.

These problems arise because the Majority insists that the agency only fails to meet its burden if a bond is necessary *and* beneficial. While there has been Superior Court caselaw to that effect,[96] this Court has never endorsed such a standard. As

---

[96] *See, e.g., In re P.A.B.*, 570 A.2d 522, 525 (Pa. Super. 1990). The Superior Court first used the phrase "necessary and beneficial" in *P.A.B.* The Superior Court proclaimed:

> The bond with parents is unique and irreplaceable, making preservation of family ties *prima facie* in the best interests of the child. Conversely, where preserving family unity in form when no parent-child relationship exists will in fact cast the child into an unstable and unhappy environment, a consideration of the child's needs and welfare may warrant termination. If, as here, ties with natural parents are present and are an active force in the child's life, then needs and welfare becomes a concept that argues against termination rather than fosters it.
>
> It follows that in a termination proceeding under 2511(a)(5), a court, in considering what situation would best serve the child's needs and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial. Hence, the party seeking termination, the one that bears the burden, must prove that the family ties either do not exist or no longer help but rather hinder the children. That the child has already been removed from the home, as is always the case in a termination proceeding instituted under 2511(a)(5), does not in itself mean that a beneficial parent-child bond does not exist. This fact alone cannot be dispositive of whether termination best serves the child's needs and welfare. Thus, to apply the statute correctly, there must be an inquiry into the status of the bond, regardless of whether the parents have a physical or mental incapacity.

*Id.* (cleaned up). The Superior Court offered no explanation of what type of bond would constitute a "necessary" bond for a child. Its focus was on whether a bond existed and whether it was beneficial to the child.

explained above, the Court did not adopt this standard in *T.S.M.* And in the Majority's own words, in *E.M.*, we "contemplated" that "'a beneficial bond[]' *or* 'intense bond'" might warrant denial of a termination petition.[97] We did not mandate that the bond had to meet both aspects. Requiring the bond to be both necessary *and* beneficial is inflexible and may not meet a particular child's overall needs and welfare.

The Majority denies that its decision today pre-determines that most parent-child bonds are unworthy of preservation.[98] The Majority also insists that "courts may weigh the child's feelings and affection towards a parent, *relative to all* her developmental, physical, and emotional needs and welfare."[99] But these assertions are at odds with the actual framework that the Majority has created today. If the Majority was serious, there would be no need to slap a universal and difficult-to-define label onto one factor. Nor would there be a need to force the trial court to predict the level of harm that might befall the child and to pinpoint such harm within an artificial range.

I disagree with application of a label when it is almost impossible to describe the meaning of the label in the abstract. The Majority includes the disclaimer that it is not prescribing "magic words" for the trial court's recital,[100] yet that is exactly the effect (if not the intent) of the Majority's decision to interject abstract, amorphous labels into one factor of its four-factor Section 2511(b) analysis. The Majority offers no explication of what constitutes a "necessary and beneficial bond." It merely advances a proposal for what happens in the absence of such a bond. Apparently, the answer lies in the type of bond that, if severed, would "predictably cause 'extreme emotional consequences' or

---

[97]     Maj. Op. at 37 n.22 (citing *E.M.*, 620 A.2d at 485) (emphasis added).

[98]     *Id.*

[99]     *Id.* at 39 n.24.

[100]    *Id.* at 45.

significant, irreparable harm."[101]  The Majority later explains that "evidence that severance would cause the child to suffer extreme emotional consequences is one way to demonstrate a necessary and beneficial bond, rather than the only way to preclude termination."[102]  This explanation serves only to complicate the analysis.  Under the Majority's confused attempts to explain its universal bond evaluation standard, a "necessary and beneficial" bond is one whose severance does *more* than cause an "adverse effect"[103] and *may* cause "extreme emotional consequences,"[104] yet it also is a bond whose severance *could* generate an effect that lies between "adverse" and "extreme."[105, 106]

---

[101]     *Id.* at 38.

[102]     *Id.* at 45 n.30.  Considering that the burden always remains with the petitioner to prove that termination serves a child's needs and welfare, it is unclear who would "demonstrate a necessary and beneficial bond."  The petitioner certainly would have no interest in doing so.  Its goal would be to demonstrate the *absence* of a necessary and beneficial bond.

[103]     *See id.* at 36-37.

[104]     *See id.* at 38.

[105]     *See id.* at 45 n.30.

[106]     Discerning the effect upon the child of severing the parent-child bond is a difficult task, because it essentially requires the trial court to predict the effect upon the child of an event that is yet to occur.  Adding an amorphous threshold only serves to befog this prediction.  It is not clear to me what evidence would need to exist in a record to prevent an appellate court from overturning the trial court's refusal to terminate parental rights because of a parent-child bond.  Would predictions of outbursts, anxiety, or nightmares suffice to establish that a child's reaction is more than adverse?  Or do only behaviors such as self-harm, suicide attempts, or aggression cross the adverse threshold?  Is an expected diagnosis of a mental health disorder required?  Can outpatient therapy to address feelings of loss or insecurity meet the standard?  Or is only a need for inpatient therapy or hospitalization more than an "adverse impact"?  Are we only concerned about a child who risks alienating the foster family and jeopardizing the placement, such that the level of foster parents' tolerance would play a role in the analysis?  The Majority provides no answers.  It cannot do so, particularly under the established rubric that affords the trial court discretion to evaluate an individual child's circumstances.

The closest that the Majority gets to an articulation of its standard is when it proclaims that courts must "refine their focus on the child's development and mental and emotional health rather than considering only the child's 'feelings' or 'affection' for the parent, which even badly abused and neglected children will retain."[107] To be sure, there is a difference between a child who may experience some transient feelings of sadness from the legal severance of a parent's relationship and a child who may experience more significant effects upon his or her developmental, mental, or emotional health. That a child has "feelings" or "affection" for a parent does not mean that the relationship is one that is beneficial for the child, nor does it mean that those feelings override all other aspects of a needs and welfare analysis. But directing courts to focus upon the impact to a child's mental or emotional health means little if the court cannot even consider "an adverse or detrimental impact" and weigh it against the other factors.[108] This erases a child's "feelings" and "affection" from the equation entirely, even though the analysis is supposed to focus upon the child and the child's emotional needs and welfare.

The Majority acknowledges that every termination of parental rights case is a "difficult and fraught process" that has "heavy and irrevocable consequences," and invokes the familiar moniker that such termination represents the "death penalty" for the parent-child relationship.[109] Because severance of a "necessary and beneficial" relationship involves more than "the 'adverse' impact" that "may occur whenever a bond

---

[107]   *Id.* at 39 (citing *T.S.M.*, 71 A.3d at 267) (quoting *In re K.K.R.-S.*, 958 A.2d 529, 535 (Pa. Super. 2008))).

[108]   Maj. Op. at 39.

[109]   *Id.* at 40.

is present,"[110] it seems that the Majority intends that the burden of proving that a "bond is not necessary and beneficial"[111] should be readily attainable for the petitioner.

Thus, while the Majority purports to equalize the four factors that it prescribes and to permit trial courts to wield their discretion in weighing those factors, in reality the Majority restricts the trial courts' ability to afford most parent-child bonds very much consideration among the factors at all. There is no need to so restrict the weight given to the parental bond, particularly inasmuch as agencies already hold so many cards in the deck. As recognized by the Supreme Court of the United States, the agency must meet the high burden of "clear and convincing evidence" in part due to the state's "ability to assemble its case" with "an array of public resources," which "almost inevitably dwarfs the parents' ability to mount a defense."[112]

The Majority's disregard of the adverse effect of severing parent-child bonds minimizes the pain inflicted upon children when bonds are severed in the quest for permanency. The Majority's scheme removes discretion from the trial court and pre-weights the court's Section 2511(b) analysis toward adoption. Doing so further exacerbates the incessant focus upon "permanency" to the extent that this magic word has become a slogan or mantra that automatically supersedes all other needs and all other aspects of child welfare. I fully recognize and agree that security and stability are

---

[110]   *Id.* at 37.

[111]   *Id.* at 45.

[112]   *Santosky v. Kramer*, 455 U.S. at 760, 763. In fact, "because the child is already in agency custody, the [s]tate even has the power to shape the historical events that form the basis for termination." *Id.* at 763; *see also S.K.L.R.*, 256 A.3d at 1129 (admonishing a child welfare agency for not adhering to concurrent permanency planning and "cutting in half" a parent's contact with the children due to the agency's presumption that the court would grant its petition to terminate the parent's rights involuntarily).

two crucial needs for children.[113]  I most certainly do not maintain that trial courts should deny every termination petition when a child and parent share a bond.  But we cannot profess to give trial courts the discretion to evaluate factors that bear upon a child's needs and welfare and then refuse simultaneously to respect those courts' discretion when they find that a parent-child relationship has value.

Parents, even flawed and struggling parents whose situations fit into the grounds of Section 2511(a), may still be able to meet aspects of a child's developmental and emotional needs and welfare even if they cannot serve in a traditional or full-time caretaking role.  No matter how beneficial the child's relationship is with a foster caregiver, a child's relationship with a parent is not easily replaced or replicated.[114]  Families are not fungible.[115]  The appealing image of foster parents "saving" abused and neglected

---

[113]    *Accord In re T.S.*, 192 A.3d 1080, 1104 (Pa. 2018) (Wecht, J., dissenting) ("Having spent several years presiding in juvenile cases, I recognize and appreciate the importance of delivering permanency to the children involved in these contested TPR proceedings and the value of doing so without undue delay.").

[114]    *See* Randi Mandelbaum, *Re-Examining and Re-Defining Permanency From Youth's Perspective*, 43 CAP.U.L.REV. 259, 297 (2015) ("As is apparent from youths' responses and from numerous psycho-social studies, the biological family remains psychologically important to youth-even in cases of previous abuse and neglect or years of physical separation."); Chris Gottlieb, *Remembering Who Foster Care is For: Public Accommodation and Other Misconceptions and Missed Opportunities in* Fulton v. City of Philadelphia, 44 CARDOZO L. REV. 1, 26-27 (2022) (describing how relationships with families of origin "carry significant emotional weight, play a central role in identity development, and are critical to successful outcomes in the vast majority of foster care cases"); Ashley Albert & Amy Mulzer, *Adoption Cannot be Reformed*, 12 COLUM. J. RACE & L. 1, 29-30 (2022) (describing how adult adoptees describe loving their adoptive parents but nevertheless still feel affected by losses inherent in adoption, which may include enduring feelings of abandonment, confusion about identity and background, and loss of the "mirroring" of biological relatives that most people take for granted).

[115]    *See* Annette Appell, *The Myth of Separation*, 6 NW J.L. & SOC. POL'Y 291 (2011) (arguing that the child welfare system perpetuates the myth that "children can be fully and existentially separated from their parents," as well as the idea that "parents are fungible" and can be replaced by an adoptive parent).

children notwithstanding,[116] children enter foster care as humans who already are interconnected with their own families and communities.[117] Many foster families do the laudable, hard work of entering into the gap that opens for children while their parents work on addressing their own personal and systemic crises. I do not discount children's meaningful attachments to their foster caregivers nor the developmental, physical, and emotional progress that children make in foster caregivers' care. But minimizing children's connection to parents or families of origin in a needs and welfare analysis does children a disservice.

The new standard formulated by today's Majority focuses upon *subtracting* relationships from children's lives instead of offering mechanisms or ideas that might *add* to the love that a child experiences while simultaneously meeting the child's important need for security, stability, and consistent care.[118] Too often, we view a parent's failure

---

[116] One theory is that adoption may be preferred because of the myth that it can wipe the slate clean and permit "innocent and wounded children to start anew with healthier, untainted families." Sacha Coupet, *Swimming Upstream Against the Great Adoption Tide: Making the Case for "Impermanence,"* 34 CAP.U.L.REV. 405, 406-07 (2005). As such, it allows society to ignore the situation "upstream" and "avoid dealing with the enormously complex root causes of child neglect and abuse." *Id.* at 410. Moreover, "with our gaze fixed downstream, we are tempted to overlook the state's failure to provide meaningful preventative services to avoid out-of-home placement, while celebrating the reconstituted adoptive nuclear family." *Id.*

[117] *See* Gottlieb, *supra,* n.114 at 27 (observing that "foster and adoptive parents are entering the lives of children who have existing relationships with their parents and extended families" and those caregivers should be chosen accordingly).

[118] *Id.* at 15 (noting that research has shown that children can develop close bonds with multiple caregivers without diminishing existing relationships). Indeed, ASFA has created circumstances that allow for children to be bonded to multiple parental figures and caregivers. One unintended consequence of concurrent planning is that, in the quest to plan simultaneously for two widely divergent outcomes within a defined timeframe, some families end up in a limbo: the parents do not make enough progress to reunify with their children, yet visitation remains at intervals sufficiently frequent enough to allow the parents and children to maintain a bond.

to meet ASFA's timeframes as an indictment upon that parent's character and love for the child. In reality, many families become ensnared in the child welfare system for complex reasons that are not easy to untangle in eighteen short months.[119] The current trend fixates upon providing security for children through legal permanency, but many children who are involved in the foster care system report being more concerned about "physical permanency" and "relational permanency."[120] Unsurprisingly, children and youth value stability and emotional connections with caring adults more than the imposition of legally binding outcomes.[121]

As scholars point out, '[r]ather than "permanency' being code for terminating parental rights and adoption," there is a "permanency continuum" that includes "a variety of options to achieve permanency, some of which require termination and some of which do not."[122] The currently prevailing narrative is that guardianships, which establish a legal relationship between a child and caregiver but do not require the termination of parental rights, are inherently less stable than termination and adoption. Yet "[e]mpirical research

---

[119]    Under Pennsylvania's ASFA-focused case law, eighteen months is the target timeframe to reunify or to terminate parental rights. *In the Interest of C.K.*, 165 A.3d 935, 944 (Pa. Super. 2017). In describing the imperative for agencies to make timely, reasonable efforts to attempt to reunify families, the Superior Court has observed: "[e]ighteen months is a very long period out of a child's short life, and there is no doubt that [eighteen] months of prolonged uncertainty is a burden borne most by the child. But [eighteen] months may seem quite short to a parent who has to overcome significant obstacles to regain custody." *Id.*

[120]    Mandelbaum, *supra*, n.114 at 275-78.

[121]    *Id.*

[122]    Josh Gupta-Kagan, *The New Permanency*, 19 U.C. DAVIS J. JUV. L. & POL'Y 1, 12 (2015).

has demonstrated that options which do not require terminations lead to caregiving relationships that last just as long as traditional adoptions."[123]

Guardianship may lack the feel-good story of adoption, but if it offers long term stability with a caregiver, perhaps it is an option that should be more readily considered. For some children, guardianship can minimize or ameliorate the trauma of loss that the child already has experienced. It is true that ASFA, as incorporated by the General Assembly into the Juvenile Act, establishes a hierarchy of permanency options, and that the General Assembly has set adoption as the preferred alternative if reunification fails.[124] But ASFA and the Juvenile Act afford courts the discretion to utilize other permanency options in cases that warrant alternative solutions.[125]

To that point, Mother argues here that there is no need to cause Child harm at all. Child could remain with her godmother under a permanent legal custodianship ("PLC")

_____

[123]   *Id.* at 18-19 (describing the research and positive effects for children, and arguing that guardianship is a secure and valuable option for permanency); Coupet, *supra*, n.116 at 412 ("[W]hile data reveal that alternatives to adoption, including subsidized guardianships, offer the same degree of lasting permanence for children, without the counter-therapeutic effects that accompany termination of parental rights and assumption of legally altered family identities, adoption still remains the most frequently pursued option once children cannot be reunified with biological parents.").

[124]   *See* 42 Pa.C.S. § 6351(f.1)(3) (including, within matters to be determined at a permanency hearing, the issue of whether "the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child.").

[125]   *See id.* The Juvenile Act also lists several exceptions to the expectation that an agency must file a petition to terminate parental rights and "identify, recruit, process and approve a qualified family to adopt the child" after a child has been in placement for at least 15 of the last 22 months. 42 Pa.C.S. § 6351(f)(9). One is that "the child is being cared for by a relative best suited to the physical, mental and moral welfare of the child." *Id.* Another is that "the county agency has documented a compelling reason for determining that filing a petition to terminate parental rights would not serve the needs and welfare of the child." *Id.*

arrangement, Pennsylvania's version of guardianship, and maintain her relationship with Mother through visitation.[126]  The Majority rejects Mother's argument on the basis that PLC is outside the scope of the present appeal.[127]  I agree that the specific question of whether the juvenile court should change Child's permanency goal to PLC is not before us, as the sole determination made at the hearing below was whether the agency met its burden to support termination of parental rights under the Adoption Act; there was no simultaneous goal change hearing under the Juvenile Act.[128]  Even if we were to agree with Mother that PLC was in the best interests of Child, we could not order such a remedy as part of our review of the termination decree.

But I disagree with any implication that the topic of PLC is off limits in cases involving the termination of parental rights, including this case.  Although the juvenile court in this case had set the permanency goal for Child as adoption well before the termination of parental rights hearing, that goal is subject to review at every permanency hearing under the Juvenile Act.[129]  In other words, the permanency goal is not an immutable status and is subject to change.

Counsel for Child dismisses any idea that PLC could offer permanency to Child or many other children.  Counsel argues that use of the "adverse effect" standard could

---

[126]     Mother's Brief at 26-27.

[127]     Maj. Op. at 48 n.33.

[128]     Consistent with a recommendation in the Pennsylvania Dependency Benchbook published by the Administrative Office of Pennsylvania Court's Office of Children and Families, courts often combine hearings on petitions for termination of parental rights under the Adoption Act with hearings on requests for a change in the permanency plan goal under the Juvenile Act.  *In re R.J.T.*, 9 A.3d 1179, 1191 n.14 (Pa. 2010).  This case is somewhat unusual because the same trial judge, sitting in Child's dependency matter, already had changed Child's permanency goal to adoption in mid-2019.

[129]     *In Int. of L.T.*, 158 A.3d 1266, 1278-79 (Pa. Super. 2017); *see also* 42 Pa.C.S. § 6351(f)(4), (f.1), and (g).

"relegate hundreds of foster children each year across Pennsylvania to a life without permanency."[130] Child's counsel even goes as far as suggesting that such a standard would make termination of parental rights and adoption "impossible in many cases," and would impose "potentially disastrous consequences" upon foster children.[131] CYF boards this bandwagon, asserting that the standard used by the trial court "risks creating a new generation of children who will languish in foster care."[132] Then, in their joint reply brief, Child and CYF declare that subsidized PLC is "a less desirable permanency goal" that robs children of a "lifelong sense of belonging and stability that adoption brings."[133]

Permanency does not equate automatically to adoption. Yes, the General Assembly has prioritized adoption over PLC, but it also has recognized PLC as a valid permanency option.[134] But we should not pretend that analysis of a child's needs and welfare at a termination of parental rights hearing pits reunification with the parent against adoption by the caregiver.[135] When a trial court analyzes whether the agency has met its

---

[130] Child's Br. at 19.

[131] *Id.* at 20.

[132] CYF Br. at 21.

[133] Jt. Reply Br. at 5.

[134] The juvenile court is tasked with conducting regular review hearings. Based upon statutory factors and the evidence presented during a permanency hearing, the juvenile court has discretion to determine "[if] and when the child will be placed with a legal custodian in cases where the return to the child's parent, guardian or custodian or being placed for adoption is not best suited to the safety, protection and physical, mental and moral welfare of the child." 42 Pa.C.S. § 6351(f.1)(3). *See also* 42 Pa.C.S. § 6301 (declaring one purpose of the Juvenile Act to be "[t]o preserve the unity of the family whenever possible *or to provide another alternative permanent family when the unity of the family cannot be maintained*.") (emphasis added).

[135] For example, Child's counsel asked Dr. Rosenblum several times about he predicted effect upon Child if she were to be removed from her godmother's care. Dr. Rosenblum responded but noted his belief that the issue before the trial court was

burden under Section 2511(b), it already has decided that the agency provided clear and convincing evidence that there are grounds under Section 2511(a). We do children a disservice when we construe Section 2511(b) to contemplate as options only a return to a parent, adoption, or languishing in foster care.[136]

Section 2511(b) asks whether, when giving primary consideration to the child's needs and welfare, the court should enact the "civil law equivalent to the death penalty, forever obliterating the fundamental legal relationships between parent and child."[137] If any relationship continues between parent and child after a termination of the parent's rights and adoption of the child, it will spring entirely from the grace or rare whim[138] of the adoptive parent. And while the legislature has allowed for a legally enforceable open adoption agreement,[139] this "is [a] purely voluntary arrangement requiring the consent of the adoptive parents," and most assuredly is not something that a court can order in

---

whether or not to terminate Mother's parental rights, not whether or not to reunify Child with Mother. N.T., 5/17/21, at 131-32.

[136] *See In re P.G.F.*, 247 A.3d 955, 978 (Pa. 2021) (Wecht, J., dissenting) ("While a child's preference about custody could be relevant to TPR (particularly if the child wants to live with the parent whose rights are subject to termination), that will not always be the case. The question that TPR proceedings ask is whether the child will have any ongoing connection with the parent and the parent's extended family. That is usually unrelated to where the child wants to live.").

[137] *In re Adoption of C.M.*, 255 A.3d 343, 362 (Pa. 2021).

[138] The Majority asserts that I have declared that open adoptions are rare in foster care. Maj. Op. at 48 n.33. I have made no such claim, other than to note that scholarship and studies suggest that caregivers adopting through foster care may be more likely to fear entering into an open adoption agreement than their counterparts adopting through the domestic infant adoption system. *See infra* n.141. My point here in referring to the grace or whim of the foster parent is simply to note that no matter what promises foster parents make prior to termination of parental rights, post-adoption contact remains within the adoptive parents' discretion.

[139] *See* 23 Pa.C.S. § 2731-2742.

conjunction with terminating a parent's rights.[140, 141]The bottom line is that if a court decides that adoption by a foster caregiver *and* continued contact with a parent serves a child's developmental, physical, and emotional needs and welfare, which is the ideal outcome recommended by CYF's own expert witness in the instant case,[142] the trial court lacks the power to compel this result at the time it is deciding whether or not to terminate parental rights.

I do not suggest that PLC is appropriate in every case where a parent-child bond exists, that continued contact with a parent is always desirable, or that adoption will not serve the needs and welfare of many children in foster care. I simply see no need to change the standard for evaluation of parent-child bonds in order to alleviate agency burdens in all termination of parental rights cases. Our current standard affords discretion to trial judges serving on the front lines to consider whether there is a parent-child bond, the nature and quality of that bond, and the predicted effect of severing that bond. Section 2511(b) and *T.S.M.* require the trial court to weigh the bond and attendant considerations alongside other matters that impact a child's developmental, physical, and emotional needs and welfare.[143] This analysis applies in *all* termination of parental rights hearings:

---

[140]    *In re Adoption of G.L.L.*, 124 A.3d 344, 348 (Pa. Super. 2015).

[141]    Although open adoption agreements are used widely in private adoptions, they are less common in adoptions stemming from foster care. *See* JaeRan Kim & Angela Tucker, *The Inclusive Family Support Model: Facilitating Openness for Post-Adoptive Families*, CHILD & FAMILY SOCIAL WORK (2019), available at https://doi.org/10.111/cfs.12675 (noting that foster parents often have negative attitudes about open adoption because of concerns about safety, even though open adoption often strengthens a child's sense of security, encourages attachment to the adoptive parents, and decreases the sense of parental abandonment).

[142]    N.T., 5/13/21, at 128-30.

[143]    When the Majority says that I "prefer[] that trial courts shy away from severing any parental bond by advocating for prolonged dependency and more guardianship and downplaying the instability children face in the foster care system," *see* Maj. Op. at 37

private parent-initiated TPRs, private adoption agency-initiated TPRs, and government-agency-initiated TPRs. It applies to TPRs involving very young children as well as older children.[144] It applies to TPRs involving children placed with caring, stable pre-adoptive caregivers who provide excellent care as well as children placed in unstable or subpar foster homes (including foster homes that arguably do not meet a child's needs any better than the child's family of origin). The Adoption Act requires a holistic balancing of the totality of a child's individual circumstances. I see no need to depart from that standard by imposing a pre-judgment that one factor does not have value unless it meets an amorphous and arbitrary threshold.

I fear that the Majority is letting its assumption that the trial court did not conduct a full analysis cloud its judgment. From my perspective, the Majority is unnecessarily imposing a universal standard to fix a problem the Majority perceives in one case.[145] The

---

n.22, it makes me seriously question whether the Majority is reading and understanding my actual words at all. The point at which a court may properly sever a parental bond is when the trial court, after considering all nuances of a child's particular situation and the evidence in the record, determines, in its ample discretion, that termination of parental rights serves a child's developmental, physical, and emotional needs and welfare. That is what the General Assembly instructed trial courts to do. Sometimes, after this analysis, the trial court will deem termination to serve a child's needs and welfare. At other times, the trial court will not. Sometimes termination and adoption is best, even if it severs a child's relationship with a parent. At other times, another form of permanency like guardianship is warranted to achieve permanency *and* protect a parent-child bond. Foster care drift is never warranted, and absolutely nothing in my dissent suggests that it is.

[144] For example, Child and CYF focus upon children under five years of age and their need for permanency. *See* Jt. Reply Br. at 5. But the standard that they ask us to create does not apply solely to younger children. It applies to older children as well. Some of those children are at pronounced risk of becoming "legal orphans" if parental rights are terminated and the agency cannot locate a pre-adoptive home or the pre-adoptive placement fails prior to adoption finalization. *See* Gottlieb, *supra*, n.114, at 26-27.

[145] If the Majority is "not invent[ing] an exhaustive list of considerations nor remov[ing] discretion from the court," and if it is merely "emphasiz[ing] factors the trial court below did not adequately consider," *see* Maj. Op. at 43 n.28, I fail to see why section A of its

Majority and I agree that a trial court must bear in mind a range of considerations when conducting a Section 2511(b) analysis, not just the mere existence of a parent-child bond.[146] As the Majority observes, the trial court here did not expressly articulate whether it considered other factors in making its analysis.[147] Today's Majority assumes that the trial court's failure to mention its consideration of other factors means that the trial court short-circuited its Section 2511(b) analysis and relied solely upon the existence of a parent-child bond in denying the petition for termination.[148] Apart from the Majority's holding that the trial court erred back then by relying upon a parent-child bond that did not meet the newly-articulated standard that the Majority imposes now, the Majority also decides that the trial court erred by failing to reference other needs and welfare factors that had factual support in the record.[149] According to the Majority, a trial court must

opinion is necessary at all. If the problem was that the trial court did not give adequate consideration to factors that already exist in the law, then a simple remand would have sufficed. But we granted allowance of appeal to consider what the proper standard is for evaluating a parent-child bond in the context of the needs and welfare analysis. See 177-78 WAL 2022. The Majority may delude itself into thinking that its words will not impact anyone but the parties and the trial judge in this case, but the words it uses to convey its standards carry precedential effect and are not limited to this one dispute.

[146] Although we share some common grounds, the Majority and I are not in full agreement concerning the distinct factors that the court must consider. *Compare* Maj. Op. at 42-43 *with* text accompanying nn. 5-19 *supra.* The factors I set forth are directly derived from this Court's decision in *T.S.M.* However, I would not limit the factors to any pre-defined list, as each case is distinct. Some factors will be present in almost every case. In that regard, the Superior Court erred by relying upon cases that made evaluation of the child's relationship with a prospective long-term caregiver optional; in *T.S.M.*, this Court clearly made such a consideration mandatory when the child is in a foster home. *See T.S.M.*, 71 A.3d at 268. That the Superior Court so erred in one portion of its analysis does not mean that the trial court made the same mistake.

[147] *See* Maj. Op. at 41-46.

[148] *Id.*

[149] *Id.* at 46.

"make clear" that the court considered all of the needs and welfare factors and applied "the correct standard . . . in weighing them."[150] Distinctly absent is a citation to any statute, rule, or case requiring trial courts to set forth expressly their treatment of each factor of a Section 2511(b) analysis or that the trial court otherwise provide any particular explication of its decision. That is because the Majority imposes this requirement for the first time in termination of parental rights cases today.[151]

The Adoption Act certainly does not require any particular discussion.[152] Nor do our rules of appellate procedure. The trial court's explanation which the Majority finds to be lacking was contained in its Rule 1925(a) opinion. That rule simply requires a court in children's fast track appeals to "file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, which may, but need not, refer to the transcript of the proceedings." Pa.R.A.P. 1925(a)(2)(ii). In accordance with the rule, the trial court provided its reasons for its decree: the existence of the parent-child bond and the detrimental effect upon Child of severing the bond. That the trial court only mentioned the parent-child bond expressly does not mean that the trial court only considered the parent-child bond and nothing else.

---

[150]    *Id.* at 45.

[151]    The Majority neglects to include any instructions as to where and when a trial court should set forth this analysis in the future. Should the court do so at the time it enters its order? Can the court issue a written opinion or make statements on the record within a reasonable time after entering the order? Can the court wait until the event of an appeal and then present its analysis in its Pa.R.A.P. 1925(a) opinion? Presumably, the Majority means the latter, as it cites to Pa.R.A.P. 1925(a) without further explanation. *See* Maj. Op. at 45.

[152]    This scheme differs from the Child Custody Act, which requires the trial court to consider certain factors and to expressly delineate the reasons for its custody decision. *See C.B. v. J.B.*, 65 A.3d 946, (Pa. Super. 2013).

As Mother points out, in other areas of the law, we presume that "when a court has facts in its possession, it will apply them."[153]  In *Commonwealth v. Jackson*, this Court applied the presumption to a juvenile court's decision of whether to certify a juvenile accused of a delinquent act to be tried in adult criminal court.[154]  The Juvenile Act set forth statutory factors for the court's consideration, but the Act did not assign any particular weight to any of the factors.[155]  Moreover, except in circumstances that were not applicable, the Act placed the burden upon the Commonwealth to provide sufficient evidence to persuade a juvenile court to certify a minor to stand trial as an adult.[156]  Accordingly, while the Juvenile Act required the juvenile court to consider all of the factors set forth in the statute, the court's ultimate task was to determine whether the Commonwealth presented sufficient evidence to justify a transfer.[157]  This Court refused to require the juvenile court to "address, *seriatim*, the applicability and importance of each factor and fact in reaching its final determination."[158]

Likewise, it was CYF's burden here to prove by clear and convincing evidence that termination of Mother's parental rights served Child's developmental, physical, and emotional needs and welfare.  As the Superior Court noted, the trial court heard evidence over the course of two days and actively questioned expert witness Neil Rosenblum, Ph.D., concerning his recommendations.[159]  It is not as if the trial judge was unaware of

---

[153]    *Commonwealth v. Moto*, 23 A.3d 989, 995 (Pa. 2011).

[154]    *Commonwealth v. Jackson*, 722 A.2d 1030, 1034 (Pa. 1999).

[155]    *Id.* at 1033.

[156]    *Id.* at 1034.

[157]    *Id.*

[158]    *Id.*

[159]    *K.T.*, 2022 WL 1793083, at *5.

Child's relationship with her foster mother. After all, the very same trial judge presided over Child's dependency case for years. This same judge, when presiding over Child's dependency matter, was the one who changed Child's permanency goal to adoption in 2019.[160] "Our trial courts are tasked with carefully considering and weighing all of the evidence presented at termination hearings in determining whether the petitioning party has met its burden of proving by clear and convincing evidence that termination meets the exacting standards outlined in the Adoption Act."[161] That the trial court was unconvinced by CYF's evidence does not mean that the trial court erred as a matter of law by ignoring particular considerations or "relevant evidence" in the record supporting other aspects of a child's needs and welfare.[162] The bottom line is that the legislature left the balancing of children's needs and welfare to the discretion of the trial court. I have no reason to believe that this trial judge did not perform his duty in this regard.

That I believe the trial court did not abuse its discretion or err as a matter of law in writing its Rule 1925(a) trial court opinion in this case is not incongruent with my belief that a more robust opinion would be helpful for the parties and appellate courts. Because the effects of a termination of parental rights are severe and irreversible, I would endorse prospectively a recommendation that trial courts provide a more robust analysis, on the record or in a written opinion, that expressly articulates whether or not the petitioner met its burden as to any applicable Section 2511(b) factor discussed in *T.S.M.*,[163] as well as any other factors that the trial court considered. At a minimum, it would be helpful for

---

[160] *See* CYF Ex. 1 (dependency orders signed by the Honorable Daniel Regan dating back to 2017).

[161] *S.K.L.R.*, 256 A.3d at 1129.

[162] *See* Maj. Op. at 45.

[163] *See* text accompanying nn. 5-19 *supra*.

reviewing courts to have a brief explanation from the trial judge as to what considerations the fact-finder deemed most persuasive and as to how the trial court balanced the factors against the competing considerations advanced by the parties. We afford much discretion to the trial judges on the front lines. And rightly so. We will not overturn the trial court absent an error of law or abuse of discretion.[164] A discussion binds the trial court closely to the "clear and convincing" evidentiary standard, focuses the court's attention upon the particular child at hand, and facilitates our appellate review of the trial court's exercise of its discretion. But I decline to impose a requirement retrospectively upon trial courts that does not exist in the statute and that did not exist when this case was tried.[165]

Because I disagree that the trial court was required to consider only a "necessary and beneficial bond," because there is evidence in the record supporting the trial court's decision, and because there is no requirement in the law for the trial court to have set forth its analysis and rationale expressly, I would affirm the trial court's disposition below.

---

[164] *See S.K.L.R.*, 256 A.3d at 1123.

[165] My position in this regard also takes into account a countervailing consideration: a more robust express written analysis requires some time allowance for trial courts. Some cases are more straightforward, while others are more complex. To require a written opinion in each and every case is to risk clogging the machinery of busy juvenile courts.